**WEISBAUM v. GERLACH et al.**

No. 446.

District Court, S. D. Ohio, W. D.

June 1, 1940.

Allen & Allen and Haveth E. Mau, all of Cincinnati, Ohio, for plaintiff.

Hawgood & Van Horn, of Cleveland, Ohio, for defendants.

NEVIN, District Judge.

This is a suit in equity arising under the patent laws of the United States. The patent in suit is Reissue No. 20,942 granted on December 6, 1938, to Jack Weisbaum (Cincinnati, Ohio), plaintiff herein.

Plaintiff filed his bill of complaint against defendants herein, George C. Gerlach and Alice L. Gerlach, a partnership doing business as Gerlach Clothing Company and Gerlach's, on April 23, 1938. Defendants own and operate a men's and boy's clothing and furnishings store in the City of Troy, Miami County, Ohio. The original bill was based on Weisbaum Patent No. 2,051,322, granted to Jack Weisbaum on August 18, 1936. In the original bill plaintiff alleges that defendants have infringed claims 1 and 3 of the original patent "by selling and causing to be sold and/or used, without right or license, within the said Southern District of Ohio, Western Division, and elsewhere, neckties bearing the mark 'Sincere Cravat' embodying the inventions and improvement of Letters Patent No. 2,051,322; a sample of said alleged infringing necktie being filed herewith, made a part hereof and marked Exhibit 'A'."—now Plaintiff's Exhibit 1, in this case.

After the filing of this suit, to-wit: on April 27, 1938, Jack Weisbaum filed an application for reissue, Serial Number 204,-700. The reissue application was favorably acted upon by the United States Patent Office and, on December 6, 1938, the reissue patent in suit was granted.

On December 14, 1938 (with the consent of defendants), plaintiff filed an amendment to the Bill of Complaint. This amendment reads as follows: "Now comes the plaintiff in the above entitled case, and with the approval of the Court, asks that the Re-issue Patent No. 20,942 of Jack Weisbaum, which resulted from the re-issue of Patent No. 2,051,322 in suit, be substituted for the original patent on which this suit was brought, it being stipulated and agreed by and between counsel that plaintiff will rely in this litigation on the original claims 1 and 3 of the original patent, such claims being Claims 1 and 3 of the re-issue patent heretofore noted." (The consent of defendants to the filing is endorsed on the Amendment.)

On May 13, 1938, defendants filed an answer to the original bill and, on August 19, 1938, a supplemental answer. On January 19, 1939, defendants filed an amendment to their answer.

In their answer to the original bill defendants deny infringement and challenge the validity of the original patent No. 2,-051,322 then in suit upon several grounds, including anticipation and prior public use; that plaintiff was not the original or first inventor of the alleged invention and because the patent was surreptitiously or unjustly obtained.

In paragraph 11 of its answer defendants allege that the claimed invention was invented and disclosed in Letters Patent of the United States and foreign countries and was described by others in various publications more than two years prior to plaintiff's application; that the names of the parties referred to "are at present unknown to this defendant, but which when known it prays leave to insert in this answer."

The supplemental answer is filed in connection with, and as a supplement to, this paragraph of the answer. In the supplemental answer defendants insert the names of alleged "earlier inventors, patentees and publishers."

Defendants' amendment to the answer was filed after and in view of the amendment filed by plaintiff to his bill of complaint substituting reissue patent No. 20,-942 for the original patent No. 2,051,322. Thus the amendment is addressed to the original bill, as modified by plaintiff's amendment thereto.

In the amendment to their answer, in addition to their other defenses, defendants challenge the validity of reissue patent No. 20,942, now in suit, on certain specific grounds applicable to it which were not applicable to the original patent.

The cause came on for hearing, therefore, on the original bill of complaint, as modified by the amendment thereto, and the answer of defendants together with their amendment and supplemental answer thereto.

On January 25, 1939, defendants filed a "Motion to Dismiss" wherein they "move that the Bill of Complaint herein be dismissed for the reason that the record of the proceedings before the Patent Office in the application which resulted in Reissue Patent Number 20,942 shows the failure on the part of the applicant to comply with the reissue statute, R.S. § 4916, 35 U.S.C. § 64, 35 U.S.C.A. § 64, and shows that the reissue patent was issued in the total absence of any statutory authority." This motion not having been theretofore determined, was, at the beginning of trial (Rec. pp. 2 et seq.), presented by counsel and argued to the court. As shown by the record, pages 3, 4, the court stated it would overrule the motion "at this time", reserving the right to make its final ruling "later on". Upon further consideration, the court adhers to its previous ruling and at this time, and again, overrules the motion to dismiss above referred to filed on behalf of defendants, to which ruling defendants may have an exception.

It is conceded that the neckties, plaintiff's Exhibits 1, 16–C and 16–D, were manufactured by M. & D. Simon Company, a corporation of the State of Ohio doing business at Cleveland, Ohio, and that the M. & D. Simon Company has conducted the defense of this suit. Under these circumstances, the M. & D. Simon Company is in privity with its customers, the Defendants, and as between it and the Plaintiff the decree will be conclusive as to all matters that were litigated or could have been litigated in this case. Warford Corp. v. Bryan Screw Machine Products Co., 6 Cir., 44 F.2d 713.

It is also conceded that the defendants have sold ties corresponding to plaintiff's Exhibits 1, 16–C and 16–D.

Jack Weisbaum, patentee and plaintiff herein, is, and for many years has been, the Superintendent of the Weisbaum Bros. Brower Company, neckwear manufacturers, Cincinnati, Ohio. This company operates under a non-exclusive royalty-free license or shop right, both under the patent in suit, and plaintiff's pre-creasing process Patent No. 2,131,545 (Ex. 34) which, however, is not involved in this action.

There is another suit in equity under the patent laws of the United States (Case No. 443, Weisbaum v. Weller, D.C., 33 F.Supp. 771) pending in this Court, wherein Jack Weisbaum (plaintiff herein) is plaintiff and W. J. Weller and W. E. Stolz, a partnership doing business as Weller-Stolz, are defendants, in which the same reissue patent as here, to-wit: No. 20,942, is in issue. The bill of complaint (directed to the original patent No. 2,051,322 as here) in the Weller-Stolz suit was filed on March 22, 1938. While the bill of complaint (later amended, substituting Reissue Patent No. 20,942 for the original patent No. 2,051,322) in the Weller-Stolz case was filed on a date prior to that on which the bill of complaint was filed in the instant case and the instant case, therefore, has the later number on the docket of the court, as a matter of fact a hearing was held and the testimony taken and concluded in the instant case prior to the hearing in the Weller-Stolz case. The hearing before the court in the case at bar started on February 3, 1939, and was concluded (so far as taking testimony was concerned) on February 14, 1939. The hear-

ing in the Weller-Stolz case was started before the court on June 26, 1939, and was not concluded until the 3rd day of November, 1939. The trial continued in the first instance through June 30, 1939, and after adjournment for good cause, was resumed on October 23, 1939. It was understood, however (Rec.Case No. 443, pp. 23, 24), that while the distinctiveness of the two cases should be preserved, nevertheless, the court would decide both cases at the same time "because they are companion cases and involve the same patent".

In addition to this, certain Exhibits in each case have also been introduced as exhibits in the other case and evidence contained in certain depositions which were taken originally for use in the Weller-Stolz case, by agreement, was also offered and made part of the record in this case.

In view of all of this and at the suggestion of counsel for defendants in the other case (letter to Court dated February 17, 1940) the court has reserved its decision in the instant case until case No. 443 could be decided at the same time. Accordingly, the court has this day filed a decision in the case of Jack Weisbaum v. Weller Stolz, No. 443. The decisions have been filed almost simultaneously. The decision in the instant case was filed after the decision in Case No. 443 (by a few minutes) due to the fact that it is the later case (No. 446) on the docket.

Reissue Patent No. 20,942 in suit is (as was the original patent No. 2,051,322) for a "Necktie". In his reissue patent the patentee states, inter alia, "my invention relates to improvements in necktie construction * * * it is an object of my invention to provide a four-in-hand tie without a liner in which the edges of the folds are so arranged underneath the creases of exposed folds so that the tie may be pressed to its original shape without the formation of polished lines extending down the exposed face of the tie. What this means is essentially that when the tie is pressed, the central portion of the tie constituting the complete thickness of four folds will be the part that is compacted, whereas the margins beyond the four-fold thickness are not compacted. Thus, no lines are formed where the thickness drops off from four thicknesses to two thicknesses. So it is that by bringing the edges of the concealed layers close enough to the fold lines bounding the face of the tie, it is possible to press the tie without leaving any indented or polished lines, and it is also in this sense that the fold lines bounding the face of the tie conceal the underlying portion. * * * It is an object of my invention in a fourfold three crease four-in-hand tie to so arrange the fabric on the bias that no reinforcement at the neck band is required and so that the formation of wrinkles during the wear of the tie is materially lessened."

As heretofore indicated, claims 1 and 3 of the reissue patent in suit are relied upon. It is agreed that these are identical in wording with claims 1 and 3 of the original patent. As to the claims, counsel for plaintiff stated: "And we in this case will refer to only claim 3, because it is very like claim 1. So, when we discuss the claims it will ordinarily be claim 3." Claim 3 reads as follows: "3. A four-in-hand tie comprising a piece of resilient fabric cut on the bias and uniformly stretchable throughout its length and having three folding creases extending throughout the length of the tie along which creases the tie is folded into four approximately even widths producing four thicknesses of fabric throughout approximately the full width of that portion of the tie which is exposed to view when in use, the first width comprising the part exposed to view when in use, the second width attached to the first and folded back against it along one creased edge of said first width, the third width attached to the first and folded back along the other creased edge of the exposed width, the fourth width attached to the third and folded back along the other creased edge of said third width, the side edges of the second and fourth widths overlying each other substantially underneath and concealed by one edge crease of the exposed width, and the creased edge between the third and fourth width being spaced slightly inwardly from and thereby concealed by the other edge of the exposed width when in use."

### Validity.

Defendants claim that the patent in suit is invalid for a number of reasons, among others, for lack of invention over the patented prior art. A number of patents are referred to in the pleadings and in the testimony (Ex. E—Rec. p. 540). They are as follows: Damon, No. 167,507; Langsdorf, No. 1,447,090; Blanchard, No. 1,599,-949; Wolfson, No. 1,826,035; Stern and Carlin No. 1,879,957; McCurrach, No. 1,891,477; Solomon, No. 1,988,092; Miles, No. 2,076,908, and Greaney, No. 182,402.

All of the foregoing patents were cited, discussed by counsel and considered by the court in connection with its decision this day rendered in Cause No. 443 in this court. In the instant case, as in the Weller-Stolz case, one of the principal patents relied upon is British Patent to Greaney, No. 182,-402 (Ex. E). As to this patent, defendants assert:

"However, the Greaney patent clearly shows a tie folded in precisely the same manner as is plaintiff's necktie, with four plies of material of substantially equal width, having the raw edges turned in, and points out as one of its advantages the absence of any lining.

"Some attempt has been made to disparage this Greaney patent and the 'Wear-Plus' tie by implying that two folded edges showed on one side of the tie. There is no evidence to this effect anywhere in the record, and while plaintiff has in Exhibits 81 and 82 (illustrated on Page 6a of his brief) tried hard to illustrate a double edge and to make this appear unattractive, this attempt is entirely afield, and unsupported by any of the testimony."

And again: "For example, take Weisbaum's claim 5 (Exhibit 7, P. 8) in comparison with the Greaney British patent, which claim is selected because it seems to be the briefest of the eleven original claims. It calls for: 'a four-in-hand tie formed with four folded plies of a piece of tie material in which edges of the plies and folds of the plies lie adjacent edges of the tie.' No word is said in this claim about bias cutting of the fabric, about stretchability, about the bar tacks, about a rolled edge, or about the many other details which have been emphasized throughout this case, but it is noted that every element is present in the Greaney patent in substantially the identical words of this claim."

Plaintiff in his brief states that:

"In discussing the constructive principle of the 'Wear Plus' tie, Mr. Fuchs testified (R. 356–361) that the tie was non-resilient and rigid; that it would wrinkle badly in wear and that it was only in vogue for six or seven months, and that the extra supply of these Wear Plus ties was sold at a most ridiculous price.

"The tie of the British patent to Greaney, even though it was made of four folds of material, did not have the bias of the material so arranged, and did not have the folds of material secured together and placed in the manner suggested in the patent in suit. The Patent Office decided that the Greaney British patent did not anticipate plaintiff's invention, and we submit that the proof which plaintiff produced in this Court certainly justifies the same conclusion."

The Greaney patent was referred to by this court in its decision in the Weller-Stolz case. After a review of the Greaney patent, along with the other prior art patents in that case, this court found (Op. page 776 of 33 F.Supp.), and here repeats as its finding in this case, that there is "nothing in the cited prior art patents to deprive plaintiff herein of the benefit of his invention for improvements in necktie construction."

Upon a further consideration of the patents here cited and relied upon and the briefs and arguments of counsel in connection therewith in the instant case, the court finds nothing to persuade it to change its view, as above expressed in Case No. 443.

■■ The court is of opinion here also, as in Case No. 443, that upon the whole of the record prior knowledge and use (to which further reference will be made in the findings) have not been established by the clear and convincing evidence required and certainly not beyond a reasonable doubt, McKay Co. v. Shott Mfg. Co., D.C., 25 F. Supp. 716, "for it is the settled rule that when the executive department of the government has granted a patent, proof of a prior use must be made out, in effect, beyond a reasonable doubt, and thus the act of the executive in granting the patent must be clearly and convincingly shown to have been unwittingly mistaken. E.g. Radio Corporation of America v. Radio Laboratories, 293 U.S. 1, 7, 8, 55 S.Ct. 928, 79 L.Ed. 163; Deering v. Winona Harvester Works, 155 U.S. 286, 300, 15 S.Ct. 118, 39 L.Ed. 153; The Barbed Wire Patent [Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.], 143 U.S. 275, 284, 12 S.Ct. 443, 36 L.Ed. 154; General Motors Company v. Leer, 2 Cir., 60 F.2d 902, 904; A. B. Dick v. Simplicator Corporation, 2 Cir., 34 F.2d 935, 939." Profilm Corp. v. Blumenstock, D.C., 31 F.Supp. 239, 243.

While not determinative of the questions here involved it may not be amiss, however, to point out that shortly after the original

patent (of which the patent in suit is a reissue) had been granted two necktie manufacturers of Kansas City, Missouri—Hipsch, Inc. and Brauer, Gressman & Cohn—made and offered for sale neckties which plaintiff claimed infringed that patent. Suit was instituted against these firms with the result that decrees were entered against them (Rec. pp. 138 et seq., 537, 538—Pltfs. Exs. 4, 4–A, 5, 5–A). Later, Wilson Bros. of Chicago began making ties which plaintiff claimed also infringed his patent and suit was brought against them. After filing an answer Wilson Bros. decided to take a license and a consent decree against them was entered (Pltfs. Ex. 6—Rec. pp. 56, 376; Pltfs. Ex. 6–A—Rec. pp. 56, 508).

A consent decree was entered in this court on May 20, 1938 in Cause No. 447 on the docket of this court entitled Jack Weisbaum, Plaintiff, v. The Edward Wren Company and Hut Neckwear Co. Inc., Defendants. An example of the alleged infringing necktie made by the Hut Neckwear Co. Inc., and sold by The Edward Wren Co. is Plaintiff's Ex. 92.

In their brief counsel for plaintiff, in commenting on the effect of these consent decrees, state: "While the Consent Decrees in the District Court in Kansas City, in Chicago and in this Court are not entitled to the weight of an actual test of the validity of the patent, in a full and complete trial such as is here involved, these Decrees certainly are persuasive that the patent is a substantial one." The court is in accord with the views thus expressed by counsel.

The language of the court in Consolidated Rubber Tire Co. v. Firestone T. & R. Co., 2 Cir., 151 F. 237, at page 238 seems pertinent and applicable here. The court say: "Grant's claims cover combinations composed of elements which, when considered separately, were all old, but which were combined by him to form a structure, which, for the first time, placed in the hands of vehicle owners a perfect rubber tire. * * * Few patents have received such immediate and well-nigh unanimous recognition. * * * This popularity may be accounted for in part by the financial ability of the owners of the patent to promote sales, but it was a most inconspicuous part. The hard-headed men of trade do not place themselves in a position where they must accept the alternative of an infringement suit or the payment of license fees for the use of an article, when an equally good article may be had for nothing. It should be and is the desire of the court in approaching the consideration of a patent for a structure which has thus won a position of unchallenged supremacy in the commercial world, to endeavor to sustain rather than defeat the claims."

Referring more specifically to the reissue patent in suit, defendants submit that it is invalid for the further following reasons, because: (1) It did not involve novelty, but employed only features shown in the prior art commercial neckties known as the Sturdifold, Edgefold, Wearplus, One-der, Gladiator and Broadstreet, and shown to be old by the prior patents to Damon, Langsdorf, Blanchard, Wolfson, Stearn et al, McCurrach, Solomon, Miles and Greaney. (2) It did not involve invention, but amounted merely to the substitution of one well known material for another well known material in a known structure. (3) By his delay in applying for a patent, plaintiff lost any rights that he might have had in the absence of this delay. (4) The original and reissue patents were obtained through misleading the Patent Office by various representations now shown to have been untrue. (5) Plaintiff failed to make, in his reissue applications, the allegations required by Statute and by Patent Office rule to show how any inadvertence, accident or mistake arose. (6) Plaintiff now has shown positively that there was no inadvertence, accident or mistake in the obtaining of his original patent, and that, therefore, in accordance with R. S. § 4916, the Commissioner of Patents was without authority to issue the reissue patent.

The foregoing suggested grounds of invalidity, the arguments urged in support thereof; the authorities cited and relied upon and, in effect, the evidence bearing on this question in the instant case, are all substantially the same as in the Weller-Stolz case, No. 443 in this court. In this latter case (No. 443) this court has, in its decision filed this day, held the reissue patent in suit to be valid. There appears to be no convincing or valid reason why, upon the whole of the record, the court should make any other finding in the instant case. For the views of the court in this connection reference is here made to the decision in the Weller-Stolz case.

In addition to all of the foregoing, the record shows that the patented tie has been

an outstanding commercial success. Mr. Louis Fuchs testified to this as well as to the commercial aspects of the prior art. Mr. Fuchs is manager of the neckwear department of the Amalgamated Clothing Workers of America. He is particularly qualified to discuss these matters because it was his duty to become familiar with the construction of all neckties submitted to the Union for the determination of piece-work rates. He testified that he understood the construction of various neckties which have come on the market during the last 20 years. A full discussion of the various prior art patents and of neckties referred to therein is contained in his testimony beginning at page 352 of the record. The patented tie is the first of the better class of so-called wash ties so constructed as that it can be washed or cleaned and pressed, without ruining the tie as such, at home. Referring to this and the patented tie itself and as evidencing its commercial success, the record shows the following:

Mr. Fuchs testifying:

"The Court: What are the properties of the Weisbaum tie that in your opinion, as a man versed in neckties, from the standpoint of having them laundered, commend the tie to the general public? A. There are two outstanding reasons, your Honor, in my opinion. One is that you have no lining to contend with, which is an additional item for the laundry man, that he has to take care of. If the lining wrinkles he, not having the experience of a necktie man, either slip stitcher or presser would have, if the lining was creased he would just press it down with the creased lining on the inside. * * *"

"A. In the month of March 1936, I began hearing about a new tie coming into the market. In fact, I was asked whether I knowed something about the new Palm Beach seam-on-the-side tie. I said: 'I heard something about it.' But it was suggested to me that I come see the tie in Rogers, Peat window, which I did. I went over to Rogers, Peat and I bought two ties, because of the fact that the window was so attractive. They had a regular beach fixed up in the window that was causing a lot of comment and conversation. In fact, while I was there, there was some manufacturers also buying these ties." * *

"Q. Will you state, if you know, whether prior to the coming on the market of these Weisbaum ties, there had been any other tie which, when laundered and returned from the laundry, would have the appearance of these ties? A. Well, frankly, answering that question, I could only answer in this manner: I have never had a tie laundered before in my life. In the first place, I did not think that they were worth while laundering. As wash ties, as they were known then, you put them on once and if you sweat at all, just for a few minutes, you would have to cut them off, if you wanted to take them off, because the cotton lining on the inside would just wrinkle up. And these are the first ties that my wife—I didn't even know she sent them to the laundry. She said they were so good that it was a shame to give them away or throw them away. I usually give them away."

Mr. E. J. Weisbaum testified:

"The Court. I think we will go back, Mr. Weisbaum. Do you know approximately, in round figures, how many dozen of these ties under this patent were sold in the year 1936?

"The Witness: Your Honor, there was a part of the quantity sold in 1936. About half the first season, you see, it was either fifty or sixty thousand dozen.

"The Court: That would be in 1936?

"The Witness: Yes sir.

"By Mr. E. S. Allen: Q. That is, 600,-000 neckties; is that right? A. Twelve times that would be about right.

"The Court: Do you know how much that amounts to in dollars?

"The Witness: Oh, I should say about four hundred and fifty or five hundred thousand dollars.

"The Court: Now, do you recall how many dozens were sold approximately in the year 1937?

"The Witness: I would say about, maybe, seventy-five or eighty thousand dozen, or a million, two or three hundred thousand neckties.

"The Court: And that would amount to about how much in dollars

"The Witness: Amount to, oh, around eight or nine hundred thousand dollars, or an increase, I think of about two hundred and fifty thousand over the first year.

"The Court: And then 1938, that was last year, about how many in dozens?

"The Witness: Last year, in dozens, we sold about one hundred and twenty to one

hundred and thirty thousand dozen, about that.

"The Court: That would amount to about how much in dollars?

"The Witness: Over a million dollars."

Mr. Harry Weisbaum testified:

"What was your experience with the success of the patented tie? A. In showing that tie, it met with instantaneous success. It increased my sales on the first trip about 300 per cent. It came out at a time when the neckwear field was at its lowest ebb for summer season. The retail price of ties during the summer season—were beginning to retail in the better stores at ten cents and twenty-five cents and three for a dollar. There wasn't a decent summer tie to be had that would stand up, and the retailers were wide open for a practical tie for the summer season."

The following appears in the stipulated (Ex. 15) testimony of Mr. Elmer Ward, President and General Manager of The Goodall Company, exclusive manufacturers of Palm Beach material:

"Q. 28. Can you give us some idea of the volume of this material which Weisbaum Co. used during the years 1936, 1937 and 1938? A. It was about 280,000 yards in 1936, about 380,000 yards in 1937, and over 400,000 yards in 1938."

In answer to the foregoing, defendants claim "that whatever success the Weisbaum tie has met upon the market need not in any way be ascribed to the structure of the patent, but that it is the direct and logical result of good merchandising, of careful selection of materials, colors, and patterns, of extensive advertising, of the use of nationally known trade-marks, and of careful observation of trends in styles and conditions of the market." This is exactly the same claim in this respect as was made by defendants in the Weller-Stolz case, No. 443. In this connection, the court here adopts and repeats what was there stated:

"It was not, however, until the fall of 1935 that Weisbaum Bros. Brower Co. finally closed an agreement with the manufacturers of Palm Beach fabric to secure one of the stock grades of Palm Beach fabric cut in a special width which the patentee designated, for the making of neckties. The commercial exploitation began at the beginning of 1936. The commercial success was immediate and followed by a remarkable development, as the figures above

show. This would seem clearly to indicate that the increase was due to the patented tie and not merely to the reputation of Weisbaum Bros. Brower Co., which had been an established organization for many years before.

"In Cleveland Trust Co. v. Schriber-Schroth Co., 92 F.2d 330, at page 335, the Court of Appeals of this (6th) Circuit, say 'It is, of course, axiomatic that commercial success is not of itself conclusive upon the question of novelty or invention, and where such success is fairly attributable to other causes, such as the reputation of the manufacturer, his extensive advertising and superior salesmanship, it will be wanting in persuasiveness. But, where no alternative inferences are to be drawn, commercial success is highly indicative of invention. This is so in the usual case where the test of success is acceptance by the public.'

"The court feels bound to conclude, upon a consideration of the whole of the record, that plaintiff has made a valuable contribution to the necktie art; that his invention is considerably more than something 'Any intelligent sewing woman with the same objective and having the same materials that he had could have done * * * without trouble.' Forchheimer v. Franc, Strohmenger & Cowan, Inc., 6 Cir., 20 F. 2d 553, 556, and that Reissue Patent No. 20,942 in suit is valid."

### Infringement.

At the trial, counsel for plaintiff (referring to claim 3 of the patent in suit) stated: "Now, that claim is what might be called a photographic claim. It is very limited, very specific. It practically says to the necktie art: 'You must not take my patent; make an exact copy of my necktie because that is what I claim. Do anything else you want, but you can't make an exact copy of my necktie.' Now, that is what the defendant has done in this case."

In their reply brief counsel assert that "defendants' tie is a Chinese copy of the patented tie." In support of these assertions counsel cite the testimony of Louis Fuchs and Harry Weisbaum. They submit that the testimony of Mr. Fuchs supported by that of Mr. Weisbaum "shows (a) the same number of folds of cloth; (b) the same number of folds of cloth; (b) the raw edges similarly spaced; (c) the outside fold edges spaced in the same manner; (d) a mode of stitching which permitted stretching throughout the tie. On the tendency of the defendant's tie to curl, this was no doubt due to the small cut away

portion at the small end. If the pull was applied by grasping the tie at the very ends thereof, it appears that the defendant's tie will curl somewhat. However, a pull applied to the portion of the tie that is pulled when tying it (i. e., the portion of the tie removed from the small tip or end thereof), an adequate lack of tendency to curl was shown. While Weisbaum uses bar tacks and defendant uses a slip stitching, both of these modes of stitching do not inhibit stretchability throughout: (Patent in suit, page 2, lines 19 to 24:)—'Thus the tacking stitches are sufficiently spaced and the manner of inserting them is such that there is no tendency to cause the tie to buckle when stretched. There is as complete resilience as occurs in a tie having a loose lining secured with loose stitching.' "

Plaintiff insists that: "There can be no serious challenge to the substantial identity of the two ties. If defendant sacrifices even pull qualities when the ties are grasped at each end by cutting off a fold in the extreme tip of the small end, this does not avoid infringement. Substantially all the advantages of the patented tie have been copied. It is well settled that leaving off unimportant descriptive details, even if included in a claim, does not avoid infringement."

Defendants on the other hand as earnestly contend that as the claim in issue is admittedly of very narrow scope "what might be called a photographic claim" or "one that takes in every detail, no matter how minute"; that "No one in this case has indicated on the record that defendant's tie corresponds with this requirement"; that plaintiff failed "to produce any statement that the tie was copied, in the detail required by the 'photographic' claim"; that "Plaintiff's brother, Edward Weisbaum, also failed to make any statement of the 'photographic' likenesses between Plaintiff's and Defendant's ties"; that "Plaintiff's other brother, Harry Weisbaum, likewise avoided making any detailed comparison of plaintiff's and defendants' ties and contented himself with generalities", and that "The witness Eigenfeld on behalf of Defendant also pointed out the differences between Plaintiff's and Defendant's ties, comparing the Plaintiff's ties, Exhibits C and C1 with Defendant's ties, Exhibits 16C and 1 (Pages 670 et seq.), showing that Plaintiff's tie requires more yardage of cloth—that there are only three plies of cloth in the small end of Defendant's tie—that the hemming is substantially different—that there were differences in spacing the side seams—and that the space between the folded edges and the raw edges within the tie were not the same—that the bias resiliency extends throughout the Plaintiff's tie, but does not extend throughout the Defendant's tie, as well as the differences in stitching."

And finally, defendants assert that "(1) The claim in issue must be limited in its "Photographic" character to a tie having sharp creases and which is uniformly stretchable throughout its length, and (2) The differences between plaintiff's and defendants' ties show that the ties only superficially resemble each other, and there is no evidence upon which a holding of infringement could rest."

From the whole of the evidence, including an examination of the tie (Ex. 1) itself (and Exs. 16–C and 16–D) and the demonstration by the witness Harry Weisbaum (Rec. p. 496), the court is of opinion that substantially all the advantages of the patented tie have been copied. Some unimportant details may have been omitted but this is not sufficient to avoid infringement. "There is a substantial identity, constituting infringement, where a device is a copy of the thing described by the patentee, 'either without variation, or with such variations as are consistent with its being in substance the same thing.' Burr v. Duryee, 1 Wall. 531, 573, 17 L.Ed. 650." Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 41, 42, 50 S.Ct. 9, 12, 74 L.Ed. 147; Dowagiac Mfg. Co. v. Superior Drill Co., 6 Cir., 115 F. 886, 904.

The court repeats and here adopts the language used by it in the Weller-Stolz case on the question of infringement: "From a consideration of all the evidence the court is of opinion that defendants have appropriated the invention of plaintiff and that defendants' structure can be fairly read on the claims asserted. A substantial equivalent of a thing is, in the sense of the patent law, the same as the thing itself. Two devices which perform the same function in substantially the same way, and accomplish substantially the same result, are the same, though they may differ in name or form. Union Paper Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935; Elizabeth v. Pavement Co., 97 U.S. 126, 137, 138, 24 L.Ed. 1000. 'One may not escape infringement by the mere joinder of two elements into one

792

integral part.' Bundy Mfg. Co. v. Detroit Time-Register Co., 6 Cir., 94 F. 524, 538."

Upon a consideration of the whole of the record in the instant case, the court finds, as it did in Case No. 443 in this court, that the reissue patent in suit is valid, and finally, that defendants' tie is a substantial copy of the patented tie containing the same structural features, and that it infringes the claims of the patent in suit.

Upon a consideration of the pleadings, the evidence as shown by the record, the briefs and arguments of counsel, and the applicable law, the court has arrived at certain findings of fact and conclusions of law, as follows:

*Findings of Fact.*

1. The patent in suit, Reissue No. 20,942, is a reissue of original patent Number 2,051,322.

2. Plaintiff, Jack Weisbaum, is the owner of United States Letters Patent Reissue No. 20,942.

3. Defendants, George C. Gerlach and Alice L. Gerlach are partners doing business as Gerlach Clothing Company and Gerlach's. They own and operate a men's and boy's clothing and furnishings store in Troy, Ohio.

4. The original bill of complaint was filed on April 23, 1938, based upon Weisbaum Patent No. 2,051,322. Thereafter, on April 27, 1938, an application for reissue of said patent was filed; on December 6, 1938 Reissue Patent No. 20,942 was granted on said application; on December 14, 1938, an amendment to the bill of complaint was filed substituting the reissue patent and alleging infringement thereof. The case is at issue upon the bill of complaint as amended and defendants' answer, supplemental answer and amendment to the answer.

5. Plaintiff's Exhibit 1 (and Ex. 16–C and 16–D) was sold by defendants to plaintiff. Defendants have sold neckties corresponding to Plaintiff's Exhibits 1, 16–C and 16–D which were made by M. & D. Simon Company, a corporation of the State of Ohio, doing business at Cleveland, Ohio.

6. The defense of this case has been conducted by M. & D. Simon Company, an Ohio corporation.

7. M. & D. Simon Company is in privity with the Defendants, and the decree in this case will be conclusive of all matters that were litigated or could have been litigated in this case between Plaintiff and Defendants and M. & D. Simon Company.

8. Plaintiff conceived the invention of the patent in suit late in the year 1932. He made paper patterns (Plaintiff's Exs. 10 and 11—Rec. p. 175 et seq.) of his patented tie from some sheets of newspaper, dated November 6, 1932, before he made his wooden patterns for his pre-creasing plates.

9. Plaintiff had the wooden patterns for the aluminum pressing plates for precreasing the blanks for forming the patented tie made at the Acme Pattern Works on or before January 20, 1933 (Rec. p. 177, Exs. 8, 8–A to 8–F, Inc.). Plaintiff's Exs. 49 and 50–A to D, 51–A to D and 52–A to D (Rec. pp. 189 et seq.) inclusive represent the steps in the manufacture of a wooden pattern for making aluminum castings. Prior to making the wooden patterns, plaintiff had made by hand a perfect tie (Rec. pp. 177, 190) in accordance with the later patented construction which was cut into strips along the fold lines and which was used for making the wooden model for the pressing plates. Plaintiff made a tie like that illustrated, described and claimed in Claim 3 of the patent in suit prior to January 20, 1933. Such a tie is in evidence as Ex. 13.

10. Bossert Machine Company machined the aluminum four-fold pressing plate castings which were cast at the Aluminum Foundry Company, Cincinnati, and fitted the castings to the Daly Press at the plant of Weisbaum Bros. Brower Co., 424 East 4th St., on or before August 4, 1933. Shortly thereafter Jack Weisbaum made neckties from blanks pre-creased on the four-fold plates, including two neckties from wool lining material, which neckties were substantially identical with the tie illustrated, described and claimed, in claim 3 of the Jack Weisbaum Reissue patent No. 20,942.

11. The folding arrangement prescribed by the precreasing plates is the same as the folding arrangement prescribed in the patent in suit and folding a tie blank in this manner the side edge of the rear fold is spaced slightly inwardly from the side edge of the front fold so as to conceal the same when in use. Further the raw edges of the inside folds will overlie and be concealed by the other edge crease.

12. During the Fall of 1933 Jack Weisbaum showed one of his wool neckties, made substantially in accordance with the

construction illustrated, described and claimed in the Weisbaum Reissue Patent No. 20,942, to Edward J. Weisbaum and tests were made by tying, pulling and pressing the ties and both Jack Weisbaum and Edward Weisbaum were interested in the construction, and Edward J. Weisbaum in the Fall of 1933 made inquiries to determine whether the Goodall Company would supply Weisbaum Bros. Brower Company with Palm Beach material for making into neckties in accordance with the patented construction.

13. From May, 1934, until December, 1935, Edward J. Weisbaum actively tried to get Palm Beach material from its manufacturers, Goodall Company, in a special width for economic cutting in the manufacture into neckties like the construction illustrated, described and claimed in the Jack Weisbaum Reissue patent No. 20,942. In the Fall of 1935 a definite agreement was made by which the Goodall Company agreed to supply the Weisbaum Bros. Brower Co. with such material.

14. During the year 1934, the Goodall Company was not interested in supplying Weisbaum Bros. Brower Co. with Palm Beach material for neckties. During this period other necktie manufacturers, to-wit: Cohn, Roth & Stiffsen of New York, Franc, Strohmenger & Cowan of New York, and Hewes & Potter of Boston, had exclusive rights to the use of Palm Beach fabric for neckties. None of these concerns ever used Palm Beach in a volume of any consequence (Pltfs. Ex. 15).

15. The inability of the necktie makers, Hewes and Potter, and Cohn, Roth & Stiffsen to successfully make neckties from Palm Beach fabric, and the rejection of the material as a tie fabric by Cluett, Peabody, made Mr. Elmer Ward, president of The Goodall Company, skeptical as to the possibility of the Weisbaum Co. making a commercially successful tie from Palm Beach fabric. This fact delayed The Goodall Company in agreeing to make fabric in necktie patterns for the Weisbaums (Rec. pp. 435 et seq.—Pltfs. Ex. 15).

16. Beginning about the first part of the year 1936, the Weisbaum patented construction was used by Weisbaum Bros. Brower Co. in a tie called "Beau Brummel Palm Beach". The patented construction was later adopted by the Weisbaum Bros. Brower Co. in a tie called "Sportown 4 Fold". From July, 1935, to July, 1939, the Weisbaum Bros. Brower Company's in-crease in the sale of ties was from an annual sale of a total volume of $1,200,000 to a total volume of $2,226,000. After Weisbaum Bros. Brower Co. began to make the patented ties in 1936, The Goodall Company sold them 280,000 yards in 1936, 380,000 yards in 1937 and 400,000 yards in 1938. This yardage was on a basis of 32 inch width goods (Ex. 15).

17. The patented construction has had a remarkable commercial success. During the year 1939 the business of Weisbaum Bros. Brower Co. practically doubled over the year 1935 (Rec. pp. 446, 490 and Pltfs. Ex. 15).

18. Prior to the advent of plaintiff's patented tie on the market, many manufacturers had patented and manufactured ties employing certain of the structural features of the patented tie, but no one had produced the combination of the patent in suit. Among these structural features are the following: (a) Resilient fabric cut on the bias; (b) four full width folds of fabric; (c) a folded construction without a lining; (d) bar tack stitches securing folds together; (e) slip stitching securing folds together.

19. The Weisbaum reissue patent No. 20,942, in suit, illustrates, describes and claims an improvement in a four-in-hand necktie made of resilient fabric cut on the bias, which is uniformly stretchable throughout, and which has three creases extending throughout the length of the tie along which creases the tie is folded into four approximately even widths, producing four thicknesses of fabric throughout the exposure portion of the tie, the raw edges of the folds being spaced and concealed within a creased edge at one side of the tie, and the edge of the back fold on the opposite side being spaced inwardly and concealed by the other edge of the exposed width, when the tie is in use.

20. Among the advantages of the patented tie are the fact that it has no lining and requires none, has its widths substantially even and the edge folds evenly laid so as to be uniformly stretchable; the spacing of the edge folds is such that, in that portion of the tie which forms the knot, the edge of the back fold will not be pushed out so as to be exposed, but this underlying edge is concealed and does not curl over or gape open when a four-in-hand knot is tied, and the slight inward spacing of the edge of the back fold is still close enough to the edge of the front

fold so that an indented shiny crease line is not formed when the tie is pressed without a cardboard form within the tie, and the natural spring in the side creases of the front of the tie will not be jammed down to a thin edge, because of the protection of the underlying fabric layers.

21. These features make it readily practical to wash or clean and press a tie so constructed at home, with the result of fully renovating the tie. There is no evidence that this has been possible with any previous tie.

22. In Exhibit 1, the tie on which this suit is based (and Pltfs. Exs. 16–C and 16–D); there has been a substantial appropriation of the structure and benefits of the patented construction.

23. Hewes and Potter, a Boston manufacturer, made ties of Palm Beach material, and Plaintiff's Exhibit 24, the "Spur" tie, is illustrative of resilient fabric cut on the bias. The construction of the Spur tie is in accordance with the Jesse Langsdorf patent No. 1,447,090. Plaintiff's Exhibits 19–23 show various unsatisfactory efforts of Hewes and Potter to make neckties from Palm Beach cloth.

24. Thomas Greaney of Boston made a necktie called "Wear Plus" of which Plaintiff's Exhibits 57a, 57b, are examples, which was made from four full width folds of fabric and was non-stretchable. It was not a commercial success (Rec. p. 360). The construction as to folds and stitching in the neckband was similar to that shown in the Thomas Greaney British patent, No. 182,402, Plaintiff's Exhibit 58. The Greaney patent lacks several features of the patent in suit.

25. Mr. I. D. Wolfson made a necktie called Silk-All-O (Rec. p. 361) of which Plaintiff's Exhibits 59, 60 are examples. It had bar tack stitches securing the back fold in position. This tie was patented by I. D. Wolfson No. 1,541,675 and 1,826,-035, Plaintiff's Exhibit 61 and 62.

26. Stern-Carlin made a necktie called One-Der of which Plaintiff's Exhibits 66 and 36, are examples which originally was a folded tie without a lining. Plaintiff also made, prior to his invention, a Gladiator tie like the One-Der construction and Plaintiff's Exhibit 36. Usage of this construction which was patented as Stern Carlin patent No. 1,879,957 was only temporary, as it was found that the tie required a lining to be successfully marketed.

27. The Rodes-Rapier tie, Ex. 44–A is a five fold tie. It was called "Edgefold". This tie was sold in the fall of 1934 or 1935. The manufacturers changed the construction of the five fold tie shown in the Solomon patent No. 1,988,092, and employed a slip stitch for holding the folds of the tie together. The Solomon patent No. 1,988,092 suggests stitching of the edges of the folds of the tie together in the central portion of its length only. No necktie like that shown in the Solomon patent has been shown to have ever been sold commercially. Solomon's invention was for a different construction than that of the patented Weisbaum tie in suit.

28. The Rodes-Rapier tie (Fall of 1934 or 1935) does not anticipate the invention of the patent in suit.

29. Smith-Altschuler and Co. distinguished between their different necktie cutting patterns by shape numbers. They made "a shape #630 necktie". This was a non-washable lined tie. There was not sufficient proof (see testimony of Harry H. Gottesman, Rec. pp. 764 et seq.) of the construction of the Smith-Altschuler tie #630, Defendants' Ex. 37. The tie produced (Ex. 37) as illustrative of the original #630 tie is structurally different than the patented tie. It has a widely spaced side seam, a lining, is not washable and could not be pressed without developing shiny lines unless a form was to be used. The construction does not anticipate the invention of the patent in suit.

30. M. & D. Simon Company, the manufacturer of defendants' necktie, Ex. 1. (and also Exs. 16–C and 16–D), made a tie called Sturdifold. Defendants' Exhibit G is a Sturdifold tie. It was sold to Ben Silverman, Barberton, Ohio, in the fall of 1934. The construction of this Sturdifold tie is different from that of the patented tie. It was made after plaintiff, Jack Weisbaum, invented the patented tie. Its construction does not anticipate the invention of the patent in suit.

31. From the date January 20, 1933, before which Jack Weisbaum is shown to have made his invention, until the patented tie was marketed commercially in the Spring of 1936, plaintiff, Jack Weisbaum, was diligent in perfecting his invention. During this period plaintiff did not abandon his invention nor employ it for commercial profit in secret.

32. The evidence does not show that prior to Jack Weisbaum's invention there

had been any commercial manufacture of neckties incorporating the inventive thought of the patented tie and no patented art cited shows this inventive thought.

33. The proofs adduced at the trial adequately showed that the original patent in suit was inadvertently lacking in the matters modified in the reissue thereof, due to the fact that the inventor thereof did not understand sufficiently the wording of the original patent and its claims.

34. There was no unreasonable delay by the patentee in filing the reissue application when the circumstances which lead him to believe it was necessary came to his attention.

35. The changes in the specification of the patent in suit when re-issuing the same do not modify the original disclosure of the patented necktie, but merely further explain its functions. This is not new matter.

36. The claims allowed in the reissue are not asserted against the defendants in this case. Only claims 1 and 3 carried over from the original patent are relied upon. The reissue specification does not alter the meaning, force and effect of said claims 1 and 3.

### Conclusions of Law.

1. Plaintiff is the inventor and sole owner of the patent in suit, being Reissue No. 20,942.

2. The invention of the patent in suit was completed prior to January 20, 1933.

3. From January 20, 1933, to August, 1933, plaintiff was diligent in proceeding to equip himself for making machine precreased ties according to his invention.

4. Ties like those of the patent in suit and in accordance with the invention made before January 20, 1933 were made by plaintiff in the Fall of 1933. Thus if the work done by January 1933 were classed as only a conception of the invention and the invention completed by reduction to practice in the Fall of 1933, the date of the invention is related back to January, 1933.

5. After making the ties in the Fall of 1933, plaintiff did not abandon his invention but was delayed in placing it on the market because of a search for an ideal fabric to be used in the tie.

6. The date of filing in the U. S. Patent Office is March 5, 1936, when Weisbaum filed his first application describing the tie of the patent in suit. The original application for the patent in suit is a division of this first application.

7. The reissue patent in suit does not contain new matter. The tie described is the same as in the original patent and the added matter is explanatory and makes clearer the points of the improvement, which is not "new matter" and does not change the invention.

8. There is no showing sufficient to warrant a finding that the Commissioner of Patents wrongfully determined that reissue was proper.

9. Weisbaum was not shown to have delayed unreasonably in filing his reissue after being advised that the original patent was defective.

10. Defendants have not shown with that degree of proof required by law an invention of the Weisbaum tie prior to Weisbaum's invention or a two years prior public use of the Weisbaum tie.

11. Those variations which appear in the defendants' tie, Exhibit 1. (and Exs. 16–C and 16–D), over the tie shown and described and claimed in the patent in suit are not such as to result in departure from 'substantial embodiment of the improvements constituting the invention of the patent in suit.

12. The patent in suit is not anticipated by the prior art, and is a valid patentable improvement thereon.

13. Weisbaum Reissue Patent No. 20,-942 is good and valid in law particularly as to claim 3 thereof.

14. Claim 3 of the Weisbaum Reissue Patent No. 20,942 has been infringed by the sale of the Sincere Tropic-tone neckties, examples of which are in evidence as Plaintiff's Exhibits 1, 16–C and 16–D.

15. M. & D. Simon Co., Cleveland, Ohio, have controlled the defense of this suit and the infringing neckties are neckties of its manufacture.

16. Plaintiff is entitled to an injunction and an accounting as prayed for, but not to treble damages.

Counsel may prepare and submit a decree in accordance with the foregoing rulings, findings and conclusions of the court.