## PROFILM CORPORATION v. BLUMENSTOCK et al.

District Court, S. D. New York.

Feb. 2, 1940.

John P. Chandler, Harry C. Bierman, and Stephen H. Philbin, all of New York City, for plaintiff.

Darby & Darby, of New York City (Walter A. Darby and Samuel E. Darby, both of New York City, of counsel), for defendants.

WOOLSEY, District Judge.

My judgment in this cause is—

1. That Claims Nos. 1, 2 and 3 of United States Patent No. 1,781,834 are valid and were infringed by the defendant.

2. That, accordingly, there should be an interlocutory judgment for the plaintiff providing for the usual injunction, carrying costs and all taxable disbursements and allowances, and referring the cause to a master to report to this Court on the damages suffered by the plaintiff and the profits made by the defendant by reason of the infringement of said patent.

I. My subject matter jurisdiction is based on the patent law. Title 28 United States Code, Section 41(7), 28 U.S.C.A. § 41(7).

There is not any question either of venue or of the locus standi of the plaintiff.

Only one defendant, Hyman Blumenstock, has appeared and been served herein.

The sole question involved is the validity of the claims in question, for their infringement is admitted if they are held to be valid.

■ II. In view of Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, it is now a work of supererogation to write a considered opinion on the facts or law in a nonjury cause or proceeding, for its place will be taken by formal findings of fact and conclusions of law separately stated.

In this proceeding, therefore, I will only find such facts as I think explain my decision and give a statement of my conclusions of law thereon.

The facts, which I find, must be supplemented by other facts to be proposed by the plaintiff when it submits, in the method hereinafter prescribed, its findings for my approval.

III. The patent here involved, No. 1,781,-834, was granted for a stencil sheet on November 18, 1930, to Louis F. D'Autremont, of Dayton, Ohio, who was assignor of one-half thereof to A. S. Daneman, of Dayton, Ohio.

Subsequently the patent was assigned by its owners in due form to the plaintiff herein, who, it is stipulated, now holds the title thereto and has all rights of recovery for infringement thereof.

IV. This is a patent for a product and not for a process.

Because, however, of the necessary correlation between the product and the manner of its use, it has not been easy, for me at least, to keep firmly in mind, as one must, the difference between the product having the potentialities which I shall now endeavor to describe, and the process which must be followed to realize them. But, on reflection, it becomes quite clear that, although the product is patented, the process did not—as the defendant's counsel contends—have to be patented for it is implicit in the product.

V. The essence of D'Autremont's disclosure, as I see it, is that he created a laminated sheet, hereinafter called the "stencil sheet", which consisted of layers of transparent substances through which a design could be traced, and then cut on the layer which was ultimately to serve as the stencil and from which the design was to be reproduced.

The layers of this "stencil sheet" were in some cases three and in some cases four.

There was always a layer of transparent paper, preferably wax paper, hereinafter called the "paper backing".

There was then spread over the whole of the "paper backing" a layer—preferably of shellac—hereinafter called the "stencil", and then over the shellac there was spread a layer of glue, hereinafter called the "transfer medium", for, by moistening it, the "stencil" could be transferred to the silk screen from which the design was to be reproduced.

If, however, lacquer was used instead of glue to constitute the "transfer medium" by which the "stencil" was to be made to adhere to the silk screen, there would be four layers in the "stencil sheet", because there would be inserted between the layer of shellac and the layer of lacquer a layer of glue or some rubber composition to assure the segregation of the lacquer from the shellac and the maintenance of true lamination in the "stencil sheet".

After the design is traced through the "stencil sheet" it is then excised from the shellacked side thereof down to the paper, and thus the "paper backing" holds the design in place.

The "paper backing" is sufficiently bonded to the shellac for this purpose, but (1) by moistening the "transfer medium" on the shellacked surface of the "stencil sheet" remaining after the design has been traced therethrough and cut thereon, and (2) by pressing the "stencil sheet" on the silk screen, it is possible to transfer the "stencil" itself to the silk screen because the "transfer medium", whether lacquer or glue, will adhere so strongly to the meshes of the silk screen as to enable the operator to remove the "paper backing" and leave the "stencil" on the silk screen ready for use.

This simple but ingenious product, exhibiting alternately the hospitalities just mentioned, thus enables its user to transfer the "stencil" from what might be called the locale of its creation to the locale of its use accurately, quickly and inexpensively.

■ D'Autremont has created a product in which the process for its use is implicit, for it cannot be used with success otherwise than as has been described.

It was not necessary, therefore, for D'Autremont to patent the method of its use because all that had to be done was to sell

the "stencil sheet" and explain to the buyer how to use it.

VI. It seems to me that the first three claims of D'Autremont's patent, No. 1,781,-834, on which the plaintiff relies herein, correctly describe the product specified in his disclosure which I have just endeavored to summarize.

The claims here in issue read as follows:

"1. A stencil sheet for reproducing multi-colored designs comprising a transparent backing sheet and a transparent film carried by but removable from said backing sheet, whereby portions of the film corresponding to selected portions of the design may be cut away and removed from the backing sheet.

"2. A stencil sheet for reproducing multi-colored designs comprising a transparent backing sheet and a transparent film carried by but removable from said backing sheet and having an adhesive outer surface.

"3. A stencil sheet for reproducing multi-colored designs comprising a transparent backing sheet and a transparent film carried by but removable from said backing sheet and having a normally dry outer surface which may be rendered adhesive by moistening the same."

VII. Before the invention of D'Autremont's product—which has the potentialities I have described above—the method of printing through a silk screen, usually followed, was by placing the silk screen over the design which was to be printed and tracing the design thereon. Then the silk screen was removed from the design, and some suitable form of coating material which would fill in the meshes thereof was applied to all the spaces around the design so that the meshes so treated would be impervious to the printing paste and would constitute the "stencil."

This was usually accomplished by a brush, and is hereinafter referred to as the "brush-in method" of "stencil" making.

The next step was to place the silk screen in contact with the article on which the print was to be made, and then to put on the screen a suitable printing paste of the color desired. The printing paste was then forced by a squeegee or some like instrument through the open meshes of the silk screen upon the object on which the print was sought to be made.

This "brush-in method" of making a "stencil" for silk screen use was slow, and it required operators more skilled and more highly paid than those required to use D'Autremont's product, and also needed the use of expensive fine mesh silk in the screen, whilst now cheaper textiles may be used.

Altogether, the result of the old method was not satisfactory, and for years the business of printing by the silk screen languished and remained, so to speak, a Cinderella among the graphic arts.

VIII. For years prior to D'Autremont's invention the silk screen printing trade had sought, as is shown by the evidence herein and by the prior art patents cited, to fill the long felt need of having a rapid, cheap and easy method of silk screen printing.

It was a problem that was known in the trade to exist, and all efforts to solve it failed until D'Autremont made his "stencil sheet" which had the characteristics of being so transparent as to make tracing through it possible and so laminated that the desired design could be excised or carved out of it, and with the laminations so artfully bonded inter sese, as to make possible a direct transfer of the "stencil", ready for use as such, to the silk screen.

The subsequent history of D'Autremont's invention shows that it has revolutionized the art of silk screen printing, and has given to it an entirely new standing among the graphic arts. Many new vistas for it have been opened, and it can now be used, not only for printing designs on flat surfaces, like paper, cardboard or textiles, but also in printing them on three dimensional objects, such as, for example, dishes and hollow ware of china and glass.

Moreover, since D'Autremont's patent and the development of his product by the plaintiff, it has become possible for designs to be printed through a silk screen which are not only pleasing from an artistic point of view, but accurate and clear.

It may, I think, fairly be said that since D'Autremont the old art of silk screen printing entered on a new era.

I think that what I have said shows that D'Autremont took what Judge Learned Hand has called "the last step which overstrode what had so far balked advance", and, consequently, that he is entitled to the status of an inventor, and that the claims of his patent here involved are valid, unless prior use has been adequately established or some other prior art has rendered them invalid. Cf. the following cases decided by the Circuit Court of Appeals

for this Circuit: Patent Royalties Corporation v. Land O'Lakes Creameries, Inc. et al., 89 F.2d 624, 627; Buono et al. v. Yankee Maid Dress Corporation, 77 F.2d 274, 276, 277; Stevens v. Carl Schmidt, Inc., 73 F.2d 54, 56; United Chromium, Inc. v. International Silver Co., 60 F.2d 913, 916, 917; R. Hoe & Co. v. Goss Printing Press Co., 30 F.2d 271, 274; H. C. White Company v. Morton E. Converse & Son Co., 20 F.2d 311, 313; Dubilier Condenser Corporation v. New York Coil Co., 20 F.2d 723, 724, 725.

IX. The defences which the defendant invokes to invalidate the claims of the D'-Autremont patent on which the plaintiff relies may perhaps conveniently be divided into three categories—

A. A prior use—allegedly in 1928—by the defendant himself of a "stencil sheet" made substantially as was the plaintiff's.

B. An anticipation of the plaintiff's product patent by the Owens process patent, No. 1,706,038, for a "Method of Preparing Masking Films and Applying them to Printing Stencils," granted March 19, 1929 on an application filed October 3, 1927.

C. That the disclosures of certain prior art patents for the making of stencils preclude any inventive act on the part of D'-Autremont, and, therefore, invalidate the three claims on which the plaintiff relies.

A. The testimony of the defendant Blumenstock, who was, of course, an interested party, is, I find, not sufficiently clear and definite to make out a case of prior use.

In an answer filed in 1938 in this cause, the defendant Blumenstock alleged that D'-Autremont, the patentee of Patent No. 1,-781,834, had been employed by him, and had stolen the invention from him. It turned out later, after D'Autremont himself was examined by deposition, that he had never been employed by the defendant, and the defendant finally agreed that he had made a mistake and withdrew this allegation of his answer.

On the witness stand at the trial Blumenstock testified that in 1910 he had received from his father a notebook written in Yiddish which contained an alleged formula for the making of what I have called a "stencil sheet".

This notebook was marked in evidence and there was a great deal of testimony taken regarding it during the trial.

The notebook was examined by Dr. Nahum Brind, a native of Russia, now resident here. Dr. Brind made a very good impression on me and seemed to me to be most remarkably qualified to deal with Blumenstock's Yiddish notebook, as to which only he was called to testify.

Dr. Brind's mother tongue, which he used at home in Russia, was Yiddish—a language about 1000 years old. He explained that Yiddish is Old German flavored by Hebrew, that it has come to be known as the Jewish language throughout the world, and like all living languages accretes useful words where it may find them.

Dr. Brind was educated in Russian schools where he learned Russian. He studied in Vienna where he graduated from the University of Vienna with the degree of Doctor of Philosophy, and there he learned German.

Dr. Brind then resided for three years in France where he learned both French and English. He seemed to know English well and impressed me as being a real scholar. Since arriving in this country, a little more than two years ago, his profession has been that of a writer and translator. The bulk of his writing has been in Yiddish, wherein he has written two books and many magazine articles, and from which he has translated many manuscripts. He has written also in German, Russian and French.

Dr. Brind did not confine his examination of the notebook solely to the formula for the making of a "stencil" but studied the entire book. After doing so, he testified that, except for the "stencil sheet" formula, it was obviously written by a Talmudic scholar who also was a teacher primarily interested in teaching children, as was shown by the fact that there is a sermon addressed to a child who is starting to learn the Bible, and various stories, riddles and examples of simple problems in arithmetic for children. This constitutes the main part of the book. But, apparently, the writer of the notebook seems also to have dabbled a little in what Dr. Brind called alchemy and which at best was a very elementary form of chemistry, involving formulae showing, inter alia, how to draw fire from or through water, how to use the blood of various animals, how to make a candle burn in the strongest wind, how to make ink, how to clean shirts. Many of these formulae were under the heading "Marvelous Performances Found in Ancient Books."

In this curiously constituted matrix, Blumenstock's formula for a stencil sheet is found.

It is somewhat strange also that, although most of the book is written in ink, the formula is written in pencil under the heading "Very Important".

Dr. Brind said that the very first sentence of the formula bristles with words which would never have been used except by a Jew who had lived in a country where English was spoken, for example, such words as "stencil", "printen" and "colors". These words were not translated into Yiddish, but were transliterated so that Yiddish characters would represent as nearly as might be the sound of the English word.

Dr. Brind considers that these words, without mentioning any others, are clear indications of the influence of English on the writer of the formula. In other parts of the notebook there are obvious Germanisms used, which is very natural because, as Dr. Brind says, the notebook purports to have been written by the defendant's father, a Galician Jew who lived near Cracow, in Polish Austria, whence the defendant came on November 22, 1925, as an immigrant.

It is, I think, very significant also that the formula in the notebook refers to "cellulose ether" which, according to the testimony, had not been discovered until after 1910, when the notebook was supposed to have been given to the defendant Blumenstock by his father.

This "stencil" formula is the only bit of allegedly contemporaneous written evidence which could conceivably be regarded as confirmatory of the defendant's prior knowledge of a "stencil sheet" similar to that of the D'Autremont patent.

After carefully going over the evidence about the notebook, I have come to the conclusion that the explanation of the so-called formula for a "stencil" contained therein is this:

The defendant first learned how to make a "stencil" when he was working with the American Display Company of New York City in 1933, when the witness Labow showed him how the "stencil sheet" was made.

At this time, of course, the D'Autremont patent, which had been granted in November 1930, was beginning to make itself felt in the silk screen printing trade, and I think that it is quite possible, although there is not sufficient evidence on which to base a definite finding thereon, that the defendant Blumenstock got a friend here to copy into Blumenstock's Yiddish notebook a Yiddish version of the formula which he had learned from Labow.

Such a procedure would have put him in position to say what was technically true that he did not write the formula into the notebook himself, and at the same time he would have it there as a kind of intellectual alibi if anyone challenged, as has been done in this cause, his use of the "stencil sheet".

I think, therefore, that the Yiddish notebook must be wholly disregarded except for the fact that it has infected the whole of Blumenstock's prior use defense.

That leaves nothing whatever with regard to the question of prior use except the oral evidence of Blumenstock, who, in my opinion, is discredited as a witness, and Mrs. Ford, to whose story, supplemented in part by Blumenstock, I should not give any credence whatever if it were not for the fact that it was such an extraordinary story that perhaps it may not have been wholly fabricated.

■ But, in any event, the evidence of prior knowledge and use of a "stencil sheet" like that of the D'Autremont patent has not been established by the clear and convincing evidence required. For it is the settled rule that when the executive department of the government has granted a patent, proof of a prior use must be made out, in effect, beyond a reasonable doubt, and thus the act of the executive in granting the patent must be clearly and convincingly shown to have been unwittingly mistaken. E. g. Radio Corporation of America v. Radio Laboratories, 293 U.S. 1, 7, 8, 55 S.Ct. 928, 79 L.Ed. 163; Deering v. Winona Harvester, 155 U.S. 286, 300, 15 S.Ct. 118, 39 L.Ed. 153; The Barbed Wire Patent, 143 U.S. 275, 284, 12 S.Ct. 443, 36 L. Ed. 154; General Motors Company v. Leer, 2 Cir., 60 F.2d 902, 904; A. B. Dick v. Simplicator Corporation, 2 Cir., 34 F.2d 935, 939.

■ As the evidence on the defense of prior use in this cause has, as it were, stopped at dead center, it will suffice for me to overrule that defense with the comment hereinabove made, instead of calling the cause to the attention of the United States Attorney to be investigated with a view to criminal proceedings for perjury against Blumenstock. For in such a proceeding

Blumenstock would have in his favor the same burden of proof which is against him in this cause.

Perhaps I should state here that my animadversions on Blumenstock's notebook and evidence must not be considered in any way as a reflection on his counsel, for I know that it is often very difficult, before a cause is explored by a trial, to find out that one has a rogue for a client.

B. There is not any prior patent cited to me of which the disclosure can, I think, be regarded as an anticipation of the D'Autremont patent.

The Owens patent, No. 1,706,038, for a "Method of Preparing Masking Films and Applying them to Printing Stencils", which was granted March 19, 1929, on application filed October 3, 1927, falls short, it seems to me, of anticipating D'Autremont's invention.

C. It seems to me to be implicit in the defendant's argument that Owens' disclosure is that instance in the prior art which most strongly tends to dilute any invention in D'Autremont's patent.

I think that the disclosure of the Owens patent was but a fumbling attempt to achieve the then desideratum of the silk screen art, i. e. having some accurate, quick and inexpensive method of making a stencil and placing it on a silk screen ready for printing.

Owens starts off with what he calls a master stencil, which is merely the old silk screen stencil made by the "brush-in method", leaving permeable only the design which has been traced on the master stencil. Then he transfers the design to what he calls a transfer sheet—not a "stencil sheet"—with the idea that he will then remove the design from the transfer sheet and put it on one or more printing stencils. Then these printing stencils are again "brushed-in", as in the old art and as in the master stencil. After thus making his so-called "printing stencil", Owens proceeds to print his design.

It is contended principally, as I understand it, that the transfer sheet involved in the Owens process is what anticipates the structure of the plaintiff's product. But so soon as the transfer sheet of the Owens patent is compared with the claims of the D'Autremont patent relied on herein by the plaintiff, it is seen that the transfer sheet of Owens does not print the design, but merely carries the design from the master stencil to the printing stencil; whereas in the D'Autremont patent we have one "stencil sheet" on which the design is cut and from which the design is reproduced by printing through the silk screen after the design is fastened to the silk screen by use of what I have referred to above in the description of D'Autremont's product, as the "transfer medium."

Therefore, I hold that the step from Owens to D'Autremont in the silk screen stencil art involved an inventive act on the latter's part.

As to the other patents invoked by the defendant, the Bostwick Patent, No. 1,111,-002; the Deeks Patent, No. 734,120; and the Davis Patent, No. 1,744,870, I think that they are not near enough to the D'-Autremont patent in any way successfully to dilute the invention which D'Autremont made and change it into an instance of mere evolution achieved in an art by a man learned therein.

X. In pursuance of Rule 52(a) of the Rules of Civil Procedure, the attorneys for the plaintiff must prepare in accordance with this opinion and submit to me through the Clerk's office findings of ultimate fact and the conclusions of law herein indicated.

I do not want any details of evidence submitted as findings of ultimate facts. But, as above indicated, there should be findings of fact additional to those herein mentioned in order that a full record of the situation herein may be made and the juridical result of this carefully tried cause preserved.

All proposed findings of fact and conclusions of law submitted to me must be *typed in triple spacing* so that I may conveniently correct them if I wish to do so.

Attorneys for the plaintiff must give five days notice of their proposed findings of fact and conclusions of law to the attorneys for the defendants.

In submitting their findings of fact, the attorneys for the plaintiff must also submit under a separate cover, bound at the left side, a short memorandum indicating the pages of the evidence on which each finding proposed by them is based. It is not a very difficult matter to prepare this memorandum which makes it possible for me to look up any question of fact about which I may be in doubt. All that is necessary is to give therein is the number of the finding and to follow it with the numbers of the supporting pages or exhibits in the record of the trial.

Attorneys for the defendant, if they are so advised, may on the return day of such notice submit to me and serve on the plaintiff's attorneys, criticisms of the findings of fact proposed by them.

As under Rule 52(a) only findings of fact and conclusions of law which I sign will be filed as part of the record herein, I suggest this course for the defendant's attorneys because counter findings will not avail them in any respect. They must take their objections, if any, to my findings and conclusions by way of appropriate assignments of error on any appeal which they may take.

After the findings of fact and conclusions of law have been signed by me, an interlocutory judgment for the plaintiff in accordance herewith may be submitted to me through the Clerk's office for signature.