## WEISBAUM v. WELLER et al.
### No. 443.

District Court, S. D. Ohio, W. D.
June 1, 1940.

Allen & Allen and Haveth E. Mau, all of Cincinnati, Ohio, for plaintiff.

Roberts, Cushman & Woodberry, of Boston, Mass., and Marechal & Noe, of Dayton, Ohio, for defendants.

NEVIN, District Judge.

This is a suit in equity arising under the patent laws of the United States. The patent in suit is Reissue No. 20,942 granted on December 6, 1938, to Jack Weisbaum (Cincinnati, Ohio), plaintiff herein.

Plaintiff filed his bill of complaint against defendants herein, W. J. Weller and W. E. Stolz, a partnership doing business as Weller-Stolz Co. (not Inc.) on March 22, 1938. Defendants own and operate a retail men's furnishing store in the City of Dayton, Ohio. The original bill was based on Weisbaum Patent No. 2,051,322, granted to Jack Weisbaum on August 18, 1936. In the original Bill plaintiff alleged that defendants infringed claims 1 and 3 of the original patent "by selling and causing to be sold and/or used, without right or license, within the said Southern District of Ohio, Western Division, and elsewhere, neckties known as 'Burmaline' embodying the inventions and improvement of Letters Patent No. 2,051,322; a sample of said alleged infringing necktie being filed herewith, made a part hereof and marked Exhibit 'A'."—now Exhibit D in this case.

After the filing of this suit, to-wit: on April 27, 1938, Jack Weisbaum filed an application for reissue, Serial Number 204,-700. The reissue application was favorably acted upon by the United States Patent Office and, on December 6, 1938, the reissue patent in suit was granted.

On June 10, 1939, plaintiff filed a supplemental bill wherein it is recited that since the filing of the original complaint the original patent No. 2,051,322 had, pursuant to the statutes, 35 U.S.C.A. § 64, been surrendered and that the reissue patent in suit had been granted on December 6, 1938, and that "At the time of filing the original bill of complaint in this suit, plaintiff was ignorant that the patent 2,051,322 was partly inoperative by reason of an insufficient specification and that he would later file an application for reissue of said patent, but that he later, to-wit, on April 27, 1938, filed an application for reissue which on December 6, 1938, was granted to him. Claims 1, 2 and 3 of the reissue patent are identical with claims 1, 2 and 3 of the original patent in suit."

In his Supplemental Bill plaintiff prays "that Reissue Patent No. 20,942 and the first three claims thereof, be substituted for the original patent named in the bill of complaint herein"; that all of the averments of the original bill be applied to Reissue Patent No. 20,942, and for all relief prayed for in the original Bill.

On July 19, 1938, defendants filed an answer to the original bill, and on June 14, 1939, an answer to the Supplemental Bill.

Defendants in their answer to the Supplemental Bill deny infringement and challenge the validity of the patent in suit upon the various grounds (anticipation, prior public use, etc.) upon which they had challenged the validity of the original patent No. 2,051,322 in their answer to the original bill of complaint. In addition, defendants challenge the validity of Reissue Patent No. 20,942 on certain specific grounds applicable to it which were not applicable to the original patent.

Defendants in their answer to the Supplemental Bill "admit that claims 1, 2 and 3 of said reissue patent contain the same words respectively as claims 1, 2 and 3 of original patent No. 2,051,322, but Defendants deny that the claims are the same in contemplation of law because by reissue new matter was added to the specification of the original patent and because by reissue changes were made in the drawings of the original patent; Defendants deny that Plaintiff complied with the statutes and deny that the original patent was reissued in accordance with the statutes" and "Defendants deny that the claims are identical in contemplation of law because by reissue new matter was added to the specification of the original patent and because by reissue changes were made in the drawings of the original patent".

Defendants aver that the patent in suit is invalid and void because the alleged inventions claimed therein were not shown in plaintiff's previous applications; because the reissue oath filed by plaintiff does not set forth any facts to show that the alleged errors, by reason of which it was claimed the original patent was wholly or partly inoperative or invalid in fact arose by inadvertence, accident or mistake; because it (Reissue Patent No. 20,942) was issued for an invention different from that described and claimed in the original patent; because new matter was added in the application for reissue to the specifications of the original patent and a new drawing substituted, and because the alleged invention is not shown in such clear, concise and exact terms as to enable anyone skilled in the art to practice the invention.

Defendants further aver that the patent in suit is invalid due to undue delay in filing the application for reissue and because during the course of such delay plaintiff had knowledge that defendants were selling neckties of certain construction, and that because of his misleading

conduct plaintiff is estopped to assert that the patent in suit is infringed "by said neckties or neckties of a similar construction".

It is conceded that the necktie, Exhibit D, was manufactured by McCurrach Organization, Inc., of New York City, and that the defense of this case has been controlled and paid for by that Organization. McCurrach Organization, Inc., is not a formal party to the case. In their brief, however, counsel for defendants state that it (McCurrach Organization, Inc.) "is in privity with its customers, the Defendants, and as between it and the Plaintiff the decree will be conclusive as to all matters that 'were litigated or could have been litigated in this case.' (Warford v. Bryan Screw Machine Products Co., 6 Cir., 44 F.2d 713."

Jack Weisbaum, patentee and plaintiff herein, is, and for many years has been, the Master Mechanic and Factory Manager of the Weisbaum Bros. Brower Company of Cincinnati, Ohio. This company operates under a non-exclusive royalty-free license or shop right, both under the patent in suit, and plaintiff's precreasing process Patent No. 2,131,545 (Ex. C) which, however, is not invloved in this action.

There is another suit in equity under the patent laws of the United States (Case No. 446) pending in this Court, wherein Jack Weisbaum (plaintiff herein) is plaintiff and George C. Gerlach and Alice L. Gerlach, doing business as Gerlach Clothing Company, are defendants, D.C., 33 F.Supp. 783, in which the same reissue patent as here, to-wit: No. 20,942, is in issue. The bill of complaint (directed to the original patent No. 2,051,322 as here) in the Gerlach suit was filed on April 23, 1938. While the bill of complaint (later amended, substituting Reissue Patent 20,-942 for the original) in the Gerlach case was filed on a date subsequent to that on which the bill of complaint was filed in the instant case and the Gerlach case, therefore, has the later number on the docket of the court, as a matter of fact a hearing was held and the testimony taken and concluded in the Gerlach case prior to the hearing in the instant case. The hearing before the court in the Gerlach case started on February 3, 1939, and was concluded (so far as taking testimony was concerned) on February 14, 1939. The hearing in the instant case was started before the court on June 26, 1939, and was not concluded until the 3rd day of November, 1939. The trial continued in the first instance through June 30, 1939, and after adjournment for good cause, was resumed on October 23, 1939. It was understood, however, that while the distinctiveness of the two cases should be preserved, nevertheless, the court would decide both cases at the same time "because they are companion cases and involve the same patent".

In addition to this, as pointed out by counsel, certain Exhibits in each case have also been introduced as exhibits in the other case and evidence contained in certain depositions which were taken originally for use in the instant case, by agreement was also offered and made part of the record in case No. 446.

In view of all of this and at the suggestion of counsel for defendants in the instant case (letter to court dated February 17, 1940) the court has reserved its decision in case No. 446 until the instant case could be decided at the same time. Accordingly, the court has this day filed a decision in the case of Jack Weisbaum v. Gerlach Clothing Company, No. 446, D.C., 33 F.Supp. 783. The decisions have been filed almost simultaneously. The decision in the instant case was filed first (by a few minutes) due to the fact that it is the first case (No. 443) on the docket.

Reissue Patent No. 20,942 in suit is (as was the original patent No. 2,051,322) for a "Necktie". In his reissue patent the patentee states, inter alia, "my invention relates to improvements in necktie construction * * * it is an object of my invention to provide a four-in-hand tie without a liner in which the edges of the folds are so arranged underneath the creases of exposed folds so that the tie may be pressed to its original shape without the formation of polished lines extending down the exposed face of the tie. What this means is essentially that when the tie is pressed, the central portion of the tie constituting the complete thickness of four folds will be the part that is compacted, whereas the margins beyond the four-fold thickness are not compacted. Thus, no lines are formed where the thickness drops off from four thicknesses to two thicknesses. So it is that by bringing the edges of the concealed layers close enough to the fold lines bounding the face of the tie, it is possible to press the tie without leaving any indented or polished lines, and it is also in this sense that the

fold lines bounding the face of the tie conceal the underlying portions. * * * It is an object of my invention in a four-fold three crease four-in-hand tie to so arrange the fabric on the bias that no reinforcement at the neck band is required and so that the formation of wrinkles during the wear of the tie is materially lessened."

As heretofore indicated, claims 1, 2 and 3 of the reissue patent in suit are relied upon. These are identical in wording with claims 1, 2 and 3 of the original patent. Claim 2, which defendants assert "is the narrowest claim of all", and claim 3, which plaintiff states "is the most limited", read as follows:

"2. A four-in-hand tie comprising a piece of fabric cut on the bias and uniformly stretchable throughout its length and having three folding creases extending throughout the length of the tie along which creases the tie is folded into four approximately even widths producing four thicknesses of fabric throughout approximately the full width of that portion of the tie which is exposed to view when in use, the first width comprising the part exposed to view when in use, the second width attached to the first and folded back against it along one creased edge of said first width, the third width attached to the first and folded back along the other creased edge of the exposed width, the fourth width attached to the third and folded back along the other creased edge of said third width, the side edges of the second and fourth widths overlying each other substantially underneath and concealed by one edge crease of the exposed width and the creased edge between the third and fourth width being ' spaced slightly inwardly from and thereby concealed by the other edge of the exposed width' when in use, and stitches spaced substantially apart securing the creased edge between the third and fourth width to the second width."

"3. A four-in-hand tie comprising a piece of resilient fabric cut on the bias and uniformly stretchable throughout its length and having three folding creases extending throughout the length of the tie along which creases the tie is folded into four approximately even widths producing four thicknesses of fabric throughout approximately the full width of that portion of the tie which is exposed to view when in use, the first width comprising the part exposed to view when in use, the second

width attached to the first and folded back against it along one creased edge of said first width, the third width attached to the first and folded back along the other creased edge of the exposed width, the fourth width attached to the third and folded back along the other creased edge of said third width, the side edges of the second and fourth widths overlying each other substantially underneath and concealed by one edge crease of the exposed width, and the creased edge between the third and fourth width being spaced slightly inwardly from and thereby concealed by the other edge of the exposed width when in use."

### Infringement.

Plaintiff asserts that the alleged infringing tie, Exhibit D, infringes each of the claims in suit; that defendants' tie comprises a piece of resilient fabric cut on the bias; the tie is uniformly stretchable throughout its length; it has three folding creases extending throughout the length of the tie, along which creases the tie is folded into four approximately even widths; the folding produces four thicknesses of fabric through approximately the full width of the tie which is exposed to view when in use; the first width comprises the part exposed to view when in use; the second width is attached to the first and folded back against it along one creased edge; the third width is attached to the first and folded back along the other creased edge; the fourth width is attached to the third and folded back along the other creased edge of said third width; the side edges of the second and fourth width overly each other substantially underneath, and are concealed by one edge crease of the exposed width; and the creased edge between the third and fourth width is spaced slightly inwardly from and thereby concealed by the other edge of the exposed width when the tie is in use.

The portion of the tie which is exposed to view when in use is the knot tying portion, as it emerges from the neckband concealed within the collar, and the exposed face of the tie which extends down from the knot to the pointed end where the folds terminate in a single ply of fabric. The extent of this portion exposed to view when in use varies with the size of the collar of the wearer as the ties are of standard length.

In their brief counsel for plaintiff submit that: "The alleged infringing tie re-

sponds substantially exactly to claim 3 of the patent. The outspread tie blank from which the infringing tie was formed corresponds substantially to the pattern shown on the patent drawings. This is shown in the photograph, Pltf. Ex. UUUU–2. The only difference in the patented tie as specifically illustrated and described, and the alleged infringing tie is that loose slip stitching is employed to hold the folds together in the infringing tie while the patentee suggests bar tacking. But the patentee suggests loose stitching, as he states that the bar tacking causes as complete resilience as occurs in a tie having a loose lining and secured with loose stitching. The claim is not limited to the manner of stitching nor is it limited to a tie blank made from a unitary piece of material. The particular infringing tie on which this suit is based is made from two pieces of fabric hemmed together. Thus two pieces of fabric are first hemmed together to form the tie blank. This tie blank or piece, is used for forming the tie."

Defendants contend that:

"Each of the three claims in suit is limited to the following features of construction:

"(1) 'four approximately even widths producing four thicknesses of fabric throughout approximately the full width of that portion of the tie which is exposed to view when in use';

"(2) 'the side edges of the second and fourth widths (i. e. the raw edges) overlying each other substantially underneath and concealed by one edge crease of the exposed width'; and

"(3) the rear crease 'being spaced slightly inwardly from and thereby concealed by the other edge of the exposed width when in use.'

"The alleged infringement, Ex. D, does not have four approximately even widths producing four thicknesses of fabric throughout approximately the full width of the tie, nor does it have the raw edges overlying each other and positioned in the side crease, nor does it have the rear crease spaced slightly inwardly as that feature is defined by the inventor."

Defendants submit that claim 2 is not infringed "because defendants tie is not secured together by bar tacks spaced substantially apart".

From a consideration of all the evidence the court is of opinion that de-

fendants have appropriated the invention of plaintiff and that defendants' structure can be fairly read on the claims asserted. A substantial equivalent of a thing is, in the sense of the patent law, the same as the thing itself. Two devices which perform the same function in substantially the same way, and accomplish substantially the same result, are the same, though they may differ in name or form. Union Paper Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935; Elizabeth v. Pavement Co., 97 U.S. 126, 137, 138, 24 L.Ed. 1000. "One may not escape infringement by the mere joinder of two elements into one integral part." Bundy Mfg. Co. v. Detroit Time-Register Co., 6 Cir., 94 F. 524, 538.

### Validity.

#### A. As to general defenses.

Defendants claim that the patent in suit is invalid for a number of reasons, among others, for lack of invention over the patented prior art. A number of patents are referred to in the pleadings and in the testimony (Exs. 79–A to H). A principal one relied upon is British Patent No. 182,-402 to Greaney (Ex. 79–G). Defendants claim that this patent "alone discloses every material and patentable characteristic of the Weisbaum claims".

It is conceded by defendants, however, that there are some distinctions between Weisbaum and Greaney. In their brief counsel say:

"There are two features mentioned in the Weisbaum claims which are not expressly mentioned in the Greaney patent: (1) That the fabric is cut on the bias. (2) That the rear crease is 'spaced slightly inwardly' from the front crease so as to be concealed by the exposed or front width of the tie. In Greaney the two side creases are practically in registry so that viewed a little from one side the rear crease would show."

"There is one other distinction, if it can be dignified as a distinction, between Weisbaum and Greaney. Weisbaum specifies in claim 2 that the rear seam is secured by 'stitches spaced substantially apart.' He describes spaced bar tacks. The spaced stitches, of course, permit the tie to stretch between stitches."

Counsel submit that: "These trivial modifications of the Greaney tie, namely, the use of bias-cut fabric and the inset rear crease, were common knowledge in the trade, called only for the expected skill of the art and did not involve inventive

genius. Indeed they were considered of so little account or so obvious that they were neither mentioned nor claimed by Weisbaum in his first patent application of March 5, 1936 (Ex. 141)."

. The Greaney patent was cited and considered by the Patent Office and there discounted as a reference. The claims of Weisbaum were allowed over the Greaney patent. In this connection defendants urge that there is now certain evidence before this court which was not before the examiner and that had such facts "been known to the examiner it is inconceivable that he could have allowed the claims". This however is, of course, entirely speculative. The court finds nothing in the cited prior art patents to deprive plaintiff herein of the benefit of his invention for improvements in necktie construction.

As pointed out by counsel for plaintiff, the Langsdorf patent No. 1,447,090 (Ex. 79–B) preassumes that a necktie must have a lining. It is a center back seam tie. The Wolfson patent No. 1,826,035 (Ex. 79–H) shows the use of bar-tacks in a lined side seam tie. The Stern and Carlin patent No. 1,879,957 (Ex. 79–C) illustrates a step in a prior patented art where the inventor was undoubtedly striving in the direction in which plaintiff reached the goal. The McCurrach patent No. 1,891,477 (Ex. 79–D) covers a folding necktie made of six folds of material. The folds were secured together with snap fasteners. The Solomon patent No. 1,988,092 (Ex. 79–E) shows a five fold tie. It does not show an inset back fold. It is not for the same invention at all, as the Weisbaum invention.

Much stress has been laid in this case on the question of prior use. It is impossible for the court to discuss the evidence in the detail into which counsel have gone in their briefs and arguments and keep the length of this decision within reasonable bounds. Further reference to this subject will be made in the findings and conclusions. In this connection, it may not be amiss, however, to quote briefly from the testimony of Mr. Jesse Langsdorf and Mr. Murray Rosof. Mr. Langsdorf was in 1936 President of Naftali Slipstitching Process, Inc. (Dep. p. 190), and is the patentee of Patent No. 1,447,090 (Ex. 79–B), cited as one of the prior art patents relied on. He is a director of Franc, Strohmenger and Cowan, the neckwear division of Cluett, Peabody & Co., "that make all the neckwear that Cluett, Pea-

body sells" (Dep. p. 191). As to Cluett, Peabody, Mr. McCurrach testified (Rec. p. 131): "Q. 'Would it be correct if I said that you expected to be able to get assistance from Cluett, Peabody Company? A. I hope to get assistance from Cluett Peabody Company and I have reason to believe that I will get some assistance from them."

Mr. Langsdorf testified (Dep. pp. 197 et seq.):

"Q. 17. Now, the first thing we discussed, was it not, was your visit to Cincinnati when you had discussed with Mr. Ed. Weisbaum a prior use which you had some information about—do you recall our discussing that? A. I recall exactly what happened at that time.

"Q. 18. You mean you recall exactly what happened in Cincinnati? A. Yes sir.

"Q. 19. Well, suppose you state exactly what happened in Cincinnati? A. Ed. Weisbaum and Harry Weisbaum showed me a copy of an advertisement in the trade paper called 'The Reporter'. This advertisement was of a concern named McCurrach on a Burmaline necktie—a necktie it called Burmaline—to which they seemed to take exception. They talked about proceeding against McCurrach. At that time I asked Ed Weisbaum what would happen if it was shown that a similar necktie to which he referred had been made before. To which he replied to me that he had a patent. My best recollection of what I said to him was to ask him whether he was kidding me or not. He said that he wasn't and that Weisbaum Brothers and Brower and Jack Weisbaum had a patent. * * *

"Q. 20. Now, when was the date of that conference? A. I believe I can get the date approximately from a couple of letters that I have here. (The witness examines his correspondence.)

"Q. 21. I might state that my records show that that conference took place on November 19th, 1937—now, does that fit in with your recollection? A. Yes sir, I believe that is correct.

"Q. 22. Now, at that time, what was the construction of necktie which you thought might anticipate the Weisbaum patent? A. It was my opinion that neckties similar to the Weisbaum patent had been made before, otherwise I would not have stated so.

"Q. 23. Now, what particularly did you have in mind as to that? A. I had no particular individual necktie in mind.

"Q. 24. Don't you recall stating to Mr. Harry Weisbaum and myself that you had gone over with Mr. Murray Rosof some records which he had in his office and had discussed the Weisbaum patent in connection with those records? A. I certainly did discuss the Weisbaum patent with Murray Rosof and quite a few other people.

"Q. 25. And at that time did you think that Murray Rosof had some evidence of a prior use? A. I don't believe he had at that time.

"Q. 26. But when you talked with us at the hotel you stated to us that you had seen certain patterns that Mr. Murray Rosof had, did you not? A. I did, yes sir.

"Q. 27. You stated to us that you had seen certain patterns which Mr. Murray Rosof had, is that right? A. Yes sir.

"Q. 28. And since having read the evidence of Mr. Murray Rosof's testimony you now wish to change that statement? A. No.

"Q. 29. You still stick to the statement that you had seen patterns in Mr. Rosof's office? A. Yes, but you asked me, if I understand you correctly Mr. Allen, about what I had seen at the time I was in Cincinnati at that particular visit, did you not?

"By Mr. Allen: Yes.

"The Witness: My recollection is that I had not seen any neckties or patterns that Mr. Rosof had at that time.

"Q. 30. You have read Mr. Rosof's testimony in this case since our conference? A. Yes.
* * *

"Q. 33. Well, now, you stated the position of Mr. Murray Rosof in your office, did you not, at our conference in New York? A. Yes, I did.

"Q. 34. Do you recall what you stated in connection with him? A. Mr. Rosof is an employee of the J. E. Langsdorf Company, Inc. and tends to his business which is principally the auditing of accounts of licensees and the general following up of our business with licensees and the securing of licenses and anything else that occurs in connection with the business of the J. E. Langsdorf Company.

"Q. 35. Well, you told us that his desk was in the same offices with yours, did you not? A. Yes sir, his office adjoins mine.
* * *

"Q. 38. Now, after our conference at the Park Central Hotel, you stated that you would look up the record of when you supplied McCurrach with the attachment by which they could make the four folded tie and you have since written advising that the shipment of this attachment was on January 5th, 1938, is that correct, that is January 6th, 1938? (The witness examines his correspondence.) A. Yes sir, that's correct.

"Q. 39. Now, isn't it true that you had advised the Weisbaums that you thought their patent was a good one?

"The Witness: That I had advised them that I thought it was a good one?

"By Mr. Allen: Yes.

"A. No sir, it is not true.

"Q. 40. I would like to hand you a letter and ask you if you recall writing that letter? (The witness examines the letter.) A. Yes, I certainly wrote this letter.

"Q. 41. Now, isn't it true that on November 7, 1936 you wrote a letter to Mr. Weisbaum in which you said: 'Received your letter and thank you for the way you have expressed yourself. Have also received a copy of your patent papers and I am very pleased to say that in my opinion you have an excellent patent. I hope the parent patent has now been issued and would like to see a copy of that whenever you get it.' Now, you certainly wrote that on November 7th, 1936? A. Yes sir."

It is the claim of plaintiff that Mr. Langsdorf is vitally interested in invalidating the patent in suit and to that end availed himself, for the benefit of himself and interested non-licensed manufacturers, of the services and assistance of Mr. Murray Rosof, an attorney-at-law, who is (Rosof Dep. p. 254) "associated with Mr. Langsdorf at 10 East 40th Street" (New York City).

On April 21, 1938, Mr. Langsdorf wrote to Weisbaum Bros., Brower Co. (Ex. K) and, referring to his new machine, stated "it is a way of making your Palm Beach shape in every detail at a substantial saving".

Mr. Rosof produced (Rosof Dep. p. 253) Exhibits Nos. 12 and 13 (cutting patterns bearing legend 71–C) and the record shows

was otherwise active in assembling and producing evidence regarding alleged prior use. He refused, however, on cross examination to answer certain proper questions with respect to some of his activities, saying (Dep. p. 269–270):

"XQ95. Now will you tell me the number of witnesses whom you interviewed in connection with this work which you did for the McCurrach Organization? A. I think the whole matter is personal and it is a matter between myself and my clients and I don't think that it should be answered.

* * *

"XQ98. Yourself and what client? A. Jimmy McCurrach."

Plaintiff claims that the cutting patterns, Exs. 12 and 13, are spurious and that they have not been shown beyond a reasonable doubt to have been used in their present condition prior to Weisbaum's invention, asserting in their brief that: "On record pages 274–277, counsel for defendant disclaimed any contention that the 71C Full Four Fold Ties which are purported to have been found in Plummer's trunk of old samples (Exs. 4 and 5) were made on 71C patterns, Exhibits 12 and 13. * * * As to the 71C Sport ties, there is no proof that these ties were of the Weisbaum construction."

It is agreed that Mr. Rosof was aware that such a letter as Exhibit AAA was being sent out and that he expected to receive contributions. In that letter it is stated:

"As you well know, a customer of McCurrach Organization, Inc. was sued by Weisbaum Bros. Brower Co. for infringement of their U. S. Patent No. 2,051,322 which covers a four-fold necktie tacked on the side, which necktie does not contain a lining (type of necktie used in making Palm Beach ties). * * * It also would be a mistake to let some one monopolize a type of construction which may be ideal for certain types of fabric, as the construction rightfully belongs to the industry.
* * *

"Accordingly, you are being asked to contribute, immediately, any sum you can afford. Kindly make your checks payable to McCurrach Organization, Inc., and mail to me or Murray Rosof, 10 East 40th Street, New York City." and "P. S. So far, those who have already agreed to contribute are Franc-Strohmenger & Cowan, Inc.; Stern, Merritt Co., Inc.; H. C. Cohn Co.; Cohan, Roth & Stiffson."

Both Mr. Langsdorf and Mr. Rosof deny having any interest in the case (Langsdorf Dep. p. 208) and counsel for defendants, in their brief, earnestly insist that there is no basis for such suggestion. They assert that: "The supposed motive is that Mr. Langsdorf is owner and manufacturer of the 'Naftali' slip stitching machine which might go into larger use if the patent were invalidated and the industry were free to make the Weisbaum tie." And say: "It would be immaterial, even if true, that Mr. Langsdorf was backing the defense. It has nothing to do with the issues of the case."

 Without dwelling upon the subject, the court feels bound to conclude from all of the evidence that both Mr. Langsdorf and Mr. Rosof have evinced an active interest in the outcome of the case and that their testimony must be viewed and weighed in that light. At any event, and upon the whole of the record, the court is of opinion that prior knowledge and use have not been established by the clear and convincing evidence required, and certainly not beyond a reasonable doubt, McKay Co. v. Shott Mfg. Co., D.C., 25 F.Supp. 716, "for it is the settled rule that when the executive department of the government has granted a patent, proof of a prior use must be made out, in effect, beyond a reasonable doubt, and thus the act of the executive in granting the patent must be clearly and convincingly shown to have been unwittingly mistaken. E. g. Radio Corporation of America v. Radio Laboratories, 293 U.S. 1, 7, 8, 55 S.Ct. 928, 79 L. Ed. 163; Deering v. Winona Harvester, 155 U.S. 286, 300, 15 S.Ct. 118, 39 L.Ed. 153; The Barbed Wire Patent, 143 U.S. 275, 284, 12 S.Ct. 443, 36 L.Ed. 154; General Motors Company v. Leer, 2 Cir., 60 F. 2d 902, 904; A. B. Dick v. Simplicator Corporation, 2 Cir., 34 F.2d 935, 939." Profilm Corp. v. Blumenstock, D.C., 31 F.Supp. 239, 243.

B. *As to specific defenses relating to the reissue patent.*

Defendants claim that the reissue patent is void for a number of specific reasons, some already hereinbefore referred to as appearing in the answer to the supplemental bill. They assert that "the reissue is invalid and all relief barred upon it for each of the following reasons":

1. It is not for the same invention as that described in the original patent.

2. There was no inadvertence, accident or mistake in the raw edge instructions and claims of the original patent.

3. There was undue delay in filing the reissue application.

4. Defendants and McCurrach Organization have intervening rights which bar an injunction and an accounting in this case.

While these various reasons are discussed at some length by counsel in their brief, the court is of opinion that the evidence does not support the asserted claims. In this respect too it should be borne in mind, as plaintiff claims, plaintiff is not suing on reissue claims but upon claims which were in the original patent. This has particular force when the alleged intervening rights of defendants and McCurrach Organization, Inc. are considered. As claimed by plaintiff defendant cannot raise an estoppel as to the original claims if they are the same as they always were. The court finds that the grounds urged specifically against the validity of the reissue patent are not well taken.

In addition to all of the foregoing, the record shows that the patented tie has been an outstanding commercial success. It shows the following: (Total sales of all ties) 1935, $1,200,000; 1936, $1,500,000; 1937, $1,900,000; 1938, $2,206,000; 1939 (half year), $1,226,000.

Mr. Harry Weisbaum, who had charge of such matters, testified that while the silk tie business remained about the same this great increase of the business in the five year period was substantially all in ties of the four-fold patented construction.

Defendants claim that this increase was due not to the patented tie but because of the styling trends, extensive advertising, and the use of well known trade-marks, as well as the fact that the Weisbaum Bros. Brower Co. is known as one of the largest necktie concerns in this country. It was not, however, until the fall of 1935 that Weisbaum Bros. Brower Co. finally closed an agreement with the manufacturers of Palm Beach fabric to secure one of the stock grades of Palm Beach fabric cut in a special width which the patentee designated, for the making of neckties. The commercial exploitation began at the beginning of 1936. The commercial success was immediate and followed by a remarkable development, as the figures above show. This would seem clearly to indicate that the increase was due to the patented tie and not merely to the reputation of Weisbaum Bros. Brower Co., which had been an established organization for many years before.

In Cleveland Trust Co. v. Schriber-Schroth Co., 92 F.2d 330, at page 335, the Court of Appeals of this (6th) Circuit, say: "It is, of course, axiomatic that commercial success is not of itself conclusive upon the question of novelty or invention, and where such success is fairly attributable to other causes, such as the reputation of the manufacturer, his extensive advertising and superior salesmanship, it will be wanting in persuasiveness. But, where no alternative inferences are to be drawn, commercial success is highly indicative of invention. This is so in the usual case where the test of success is acceptance by the public."

The court feels bound to conclude, upon a consideration of the whole of the record, that plaintiff has made a valuable contribution to the necktie art; that his invention is considerably more than something "Any intelligent sewing woman with the same objective and having the same materials that he had could have done * * * without trouble", Forchheimer v. Franc, Strohmenger & Cowan, Inc., 6 Cir., 20 F.2d 553, 556, and that Reissue Patent No. 20,942 in suit is valid. And finally that defendants' tie is a substantial copy of the patented tie, containing the same structural features, and that it infringes the claims of the patent in suit.

Upon a consideration of the pleadings, the evidence as shown by the record, the briefs and arguments of counsel, and the applicable law, the court has arrived at certain findings of fact and conclusions of law, as follows:

*Findings of Fact.*

1. The patent in suit, Reissue No. 20,942, is a reissue of original patent Number 2,051,322.

2. Plaintiff, Jack Weisbaum, is the owner of United States Letters Patent Reissue No. 20,942.

3. Defendants, Weller and Stolz, own and operate a retail men's furnishing store in Dayton, Ohio.

4. The original bill of complaint was filed on March 22, 1938, based upon Weisbaum Patent No. 2,051,322. Thereafter, on April 27, 1938, an application for reissue of said patent was filed; on December 6, 1938, Reissue Patent No. 20,942 was granted on said application; on June 10,

1939, the supplemental bill of complaint was filed, alleging infringement of said reissue patent. The case is at issue upon the supplemental bill of complaint and defendants' answer thereto.

5. Plaintiff's Exhibit D was sold by defendants to plaintiff on March 12, 1938.

6. The defense of this case has been paid for and controlled by McCurrach Organization, Inc., of 411 Fifth Avenue, New York City (Dep.p.131), the manufacturer of the necktie (Ex.D).

7. McCurrach Organization has not become a formal party to this case, but it is in privity with the Defendants, and the decree in this case will be conclusive of all matters that were litigated or could have been litigated in this case between plaintiff and defendants and McCurrach Organization.

8. Plaintiff conceived the invention of the patent in suit late in the year 1932. He made paper patterns (Exs. KKKK-1 and KKKK-2) of his patented tie from some sheets of newspaper, dated November 6, 1932, before he made his wooden patterns for his precreasing plates.

9. Plaintiff had the wooden patterns for the aluminum pressing plates for pre-creasing the blanks for forming the patented tie made at the Acme Pattern Works on or before January 20, 1933 (Rec. 702-704, Exs. UUU–1–5, Inc. and 143). Ex. LLLL–1 to 14 inclusive represent the steps in the manufacture of a wooden pattern for making aluminum castings. Prior to making the wooden patterns, plaintiff had made by hand a perfect tie in accordance with the later patented construction which was cut into strips along the fold lines and which was used for making the wooden model for the pressing plates. Plaintiff made a tie like that illustrated, described and claimed in Claim 3 of the patent in suit prior to January 20, 1933. Such a tie is in evidence as Ex. SSS.

10. Bossert Machine Company machined the aluminum four fold pressing plate castings which were cast at the Aluminum Foundry Company, Cincinnati, and fitted the castings to the Daly Press at the plant of Weisbaum Bros. Brower Co., 424 East 4th St., on or before August 4, 1933 (Ex. WWW–1). Shortly thereafter Jack Weishaum made neckties from blanks precreased on the four-fold plates, including two neckties from wool lining material, which neckties were substantially identical with the tie illustrated, described and claimed, in claim- 3 of the Jack Weisbaum Reissue patent No. 20,942.

11. The folding arrangement prescribed by the precreasing plates is the same as the folding arrangement prescribed in the patent in suit and folding a tie blank in this manner the side edge of the rear fold is spaced slightly inwardly from the side edge of the front fold so as to conceal the same when in use. Further the raw edges of the inside folds will overlie and be concealed by the other edge crease.

12. During the Fall of 1933 Jack Weisbaum showed one of his wool neckties, made substantially in accordance with the construction illustrated, described and claimed in the Weisbaum Reissue Patent No. 20,942, to Edward J. Weisbaum and tests were made by tying, pulling and pressing the ties and both Jack Weisbaum and Edward Weisbaum were interested in the construction, and Edward J. Weisbaum in the Fall of 1933 (Rec. p. 842) made inquiries to determine whether the Goodall Company would supply Weisbaum Bros. Brower Company with Palm Beach material for making into neckties in accordance with the patented construction.

13. From May, 1934, until December, 1935, Edward J. Weisbaum actively tried to get Palm Beach material from its manufacturers, Goodall Company, in a special width for economic cutting in the manufacture into neckties like the construction illustrated, described and claimed in the Jack Weisbaum Reissue patent No. 20,942. In the Fall of 1935 a definite agreement was made by which the Goodall Company agreed to supply the Weisbaum Bros. Brower Co. with such material.

14. During the year 1934, the Goodall Company was not interested in supplying Weisbaum Bros. Brower Co. with Palm Beach material for neckties. During this period other necktie manufacturers, to-wit: Cohn, Roth & Stiffsen of New York, Franc, Strohmenger & Cowan of New York, and Hewes & Potter of Boston, had exclusive rights to the use of Palm Beach fabric for neckties. None of these concerns ever used Palm Beach in a volume of any consequence.

15. The inability of the necktie makers, Hewes and Potter, and Cohn, Roth & Stiffsen to successfully make neckties from Palm Beach fabric, and the rejection of the material as a tie fabric by Cluett, Peabody, made Mr. Elmer Ward, president of

The Goodall Company, skeptical as to the possibility of the Weisbaum Co. making a commercially successful tie from Palm Beach fabric. This fact delayed The Goodall Company in agreeing to make fabric in necktie patterns for the Weisbaums.

16. Beginning about the first part of the year 1936, the Weisbaum patented construction was used by Weisbaum Bros. Brower Co. in a tie called "Beau Brummel Palm Beach". The patented construction was later adopted by the Weisbaum Bros. Brower Co. in a tie called "Sportown 4 Fold". From July, 1935, to July, 1939, the Weisbaum Bros. Brower Company's increase in the sale of ties was from an annual sale of a total volume of $1,200,000 to a total volume of $2,226,000. Of this increase $906,000 was in the sale of ties made in accordance with the patented construction.

17. The patented construction has had a remarkable commercial success. During the year 1939 the business of Weisbaum Bros. Brower Co. "practically doubled over the year 1935". The Goodall Company gives credit for the marked commercial success of the Palm Beach tie by Weisbaum Bros. Brower Co., to the folded construction without a lining suitable for washing.

18. Prior to the advent of plaintiff's patented tie on the market, many manufacturers had patented and manufactured ties employing certain of the structural features of the patented tie, but no one had produced the combination of the patent in suit. Among these structural features are the following: (a) Resilient fabric cut on the bias; (b) four full width folds of fabric; (c) a folded construction without a lining; (d) bar tack stitches securing folds together; (e) slip stitching securing folds together.

19. The Weisbaum reissue patent No. 20,942, in suit, illustrates, describes and claims an improvement in a four-in-hand necktie made of resilient fabric cut on the bias, which is uniformly stretchable throughout, and which has three creases extending throughout the length of the tie along which creases the tie is folded into four approximately even widths, producing four thicknesses of fabric throughout the exposure portion of the tie, the raw edges of the folds being spaced and concealed within a creased edge at one side of the tie, and the edge of the back fold on the opposite side being spaced inwardly and concealed by the other edge of the exposed width, when the tie is in use.

20. Among the advantages of the patented tie are the fact that it has no lining and requires none, has its widths substantially even and the edge folds evenly laid so as to be uniformly stretchable; the spacing of the edge folds is such that, in that portion of the tie which forms the knot, the edge of the back fold will not be pushed out so as to be exposed, but this underlying edge is concealed and does not curl over or gape open when a four-in-hand knot is tied, and the slight inward spacing of the edge of the back fold is still close enough to the edge of the front fold so that an indented shiny crease line is not formed when the tie is pressed without a cardboard form within the tie, and the natural spring in the side creases of the front of the tie will not be jammed down to a thin edge, because of the protection of the underlying fabric layers.

21. These features make it readily practical to wash or clean and press a tie so constructed at home, with the result of fully renovating the tie. There is no evidence that this has been possible with any previous tie.

22. In Exhibit D (the tie on which this suit is based), there has been a substantial appropriation of the structure and benefits of the patented construction. The tie (Ex. D) prior to the removal of the stitching pulled like a tie made in the patented construction, and responds in the dimensions that are significant to those which are essential to functioning as described in the patent in suit.

23. The date of manufacture of the Plummer ties, Exs. 4 and 5 is indefinite. There is not sufficient proof that ties like Def. Exs. 4 and 5 were ever sold or displayed for sale. The earliest date for the samples asserted by defendants is June 1st, 1933.

24. W. O. Horn & Bro. made folded ties with loose linings, which loose linings could be pulled out from the ties without disturbing the stitching. It appears that all ties marked with the letter "C" had linings.

25. There is proof that a 71C Four Fold tie was made by W. O. Horn & Bro. which had an edge seam. This tie was not like the patented tie. Upon the whole of the record there is doubt that W. O. Horn &

Bro. ever made a tie like the patented tie, or ever sold ties like Exs. 4 and 5.

26. W. O. Horn & Bro. sold a tie invoiced as 71C Sport tie in 1930 and 1931. The proof is not sufficiently convincing that the invoices for 71C Sport ties covered the sale of ties like the Plummer ties. No 71C Sport tie was produced from which the construction of the ties invoiced could be determined.

27. The McCurrach patent 1,891,477 (Ex. 79–D) shows a six fold wash tie, the folds of which are secured together by snap fasteners. There is no proof that any spacing of the back folds from the front fold was other than inadvertent. The presence of the snap fasteners would make pressing over the front surface of the tie impracticable.

28. Morris Solomon's four folded necktie blank, Ex. 66 was an abandoned experiment (Dep. Alfred Kurtz, p. 10 et seq.).

29. The Morris Solomon five fold tie produced, Ex. 29 (Dep. Edwin Levisohn, p. 322), was like the construction shown in the Solomon patent No. 1,988,092, Ex. 79E. The tie had rows of stitching in the neckband only and the folds of the tie were otherwise not secured together. The Solomon tie could not be laundered and repressed like the patented tie.

30. The Rodes Rapier tie, Ex. 44A, is a five fold tie. It was called "Edgefold" (Ex. 43). James McCurrach testified that a five fold construction is too bulky for a fabric like Burmaline (the resilient fabric used by his company in the tie, Ex. D), and the yardage required would take the tie out of the $1 class.

31. The Rodes-Rapier tie (Fall of 1934 or 1935) does not anticipate the invention of the patent in suit.

32. There was not sufficient proof (see testimony of Harry H. Gottesman, Dep. pp. 359 et seq., Rec. pp. 368, 369) of the construction of the Smith-Altschuler tie #630 (Ex. 37). The tie produced as illustrative of the original #630 tie is structurally different than the patented tie. It has a widely spaced side seam, a lining, is not washable and could not be pressed without developing shiny lines unless a form was to be used.

33. From the date January 20, 1933, before which Jack Weisbaum is shown to have made his invention, until the patented tie was marketed commercially in the Spring of 1936, plaintiff, Jack Weisbaum, was diligent in perfecting his invention. During this period plaintiff did not abandon his invention nor employ it for commercial profit in secret.

34. The evidence does not show that prior to Jack Weisbaum's invention there had been any commercial manufacture of neckties incorporating the inventive thought of the patented tie and no patented art cited shows this inventive thought.

35. The proofs adduced at the trial adequately showed that the original patent in suit was inadvertently lacking in the matters modified in the reissue thereof, due to the fact that the inventor thereof did not understand sufficiently the wording of the original patent and its claims.

36. There was no unreasonable delay by the patentee in filing the reissue application when the circumstances which lead him to believe it was necessary came to his attention.

37. The changes in the specification of the patent in suit when re-issuing the same do not modify the original disclosure of the patented necktie, but merely further explain its functions. This is not new matter.

38. The claims allowed in the reissue are not asserted against the defendants in this case. Only claims 1, 2 and 3 carried over from the original patent are relied upon. The reissue specification does not alter the meaning, force and effect of said claims 1, 2 and 3.

### Conclusions of Law.

1. Plaintiff is the owner of the patent in suit, being Reissue No. 20,942.

2. The invention of the patent in suit was completed prior to January 20, 1933.

3. From January 20, 1933, to August 1933, plaintiff was diligent in proceeding to equip himself for making machine precreased ties according to his invention.

4. Ties like those of the patent in suit and in accordance with the invention made before January 20, 1933, were made by plaintiff in the Fall of 1933. Thus if the work done by January, 1933, were classed as only a conception of the invention and the invention completed by reduction to practice in the Fall of 1933, the date of the invention is related back to January, 1933.

5. After making the ties in the Fall of 1933, plaintiff did not abandon his invention but was delayed in placing it on the market

because of a search for an ideal fabric to be used in the tie.

6. The date of filing in the U. S. Patent Office is March 5, 1936, when Weisbaum filed his first application describing the tie of the patent in suit. The original application for the patent in suit is a division of this first application.

7. The reissue patent in suit does not contain new matter. The tie described is the same as in the original patent and the added matter is explanatory and makes clearer the points of the improvement, which is not "new matter" and does not change the invention.

8. There is no showing sufficient to warrant a finding that the Commissioner of Patents wrongfully determined that reissue was proper.

9. This suit being based on the original claims and not on re-issue claims, there could be no intervening rights in the defendant or in the public.

10. Weisbaum was not shown to have delayed unreasonably in filing his reissue after being advised that the original patent was defective.

11. Defendants have not shown with that degree of proof required by law an invention of the Weisbaum tie prior to Weisbaum's invention or a two years prior public use of the Weisbaum tie.

12. Those variations which appear in the defendants' tie, Exhibit D, over the tie shown and described and claimed in the patent in suit are not such as to result in departure from substantial embodiment of the improvements constituting the invention of the patent in suit.

13. The defendants' tie, Ex. D, is an infringement of claims 1, 2 and 3 of the reissue patent in suit.

14. The patent in suit is not anticipated by the prior art, and is a valid patentable improvement thereon.

15. Plaintiff is entitled to an injunction and an accounting as prayed for, but not to treble damages.

Counsel may prepare and submit a decree in accordance with the foregoing rulings, findings and conclusions of the court.